**In re Denton A. COOLEY, M.D., d/b/a Cardiovascular Associates, d/b/a Southwest Apartment Homes, d/b/a Point of Southwest, d/b/a Southwestern Plaza, d/b/a Texas American Bank Bldg., and d/b/a Cool Acres Ranch, Debtor.**

**Bankruptcy No. 88–00154–H5–11.**

United States Bankruptcy Court,
S.D. Texas,
Houston Division.

May 27, 1988.

434

Leonard H. Simon, Robert L. Pender-graft, and Mary Jane Bundschuh, Pender-graft, Elam & Simon, Houston, Tex., for debtor.

Robin Gibbs, Russell Starbird, Gibbs & Ratliff, Alan S. Gover, Robert Mrofka, Beth Nanninga, Weil, Gotshal & Manges, Houston, Tex., for First City Nat. Bank of Houston.

John Melko, Sheinfeld, Maley & Kay, Houston, Tex., for First RepublicBank Galveston.

J. Vince Hightower, Baker & Botts, Houston, Tex., for Texas Commerce Bank.

## ORDER

MARGARET A. MAHONEY,
Bankruptcy Judge.

This matter comes before me on Motion by First City National Bank of Houston ("First City") to Limit Operation of Debtor's Business. Pursuant to 28 U.S.C. § 1334(b), 28 U.S.C. § 157(a), and the District Court's Order of Reference of Bankruptcy Cases and Proceedings, I have jurisdiction over this contested matter. Since the disputed issue turns on the interpretation and application of a specific provision of Title 11, the proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(1). The following memorandum opinion shall constitute my findings of facts and conclusions of law in accordance with Bankruptcy Rule 7052 made applicable to contested matters by Bankruptcy Rule 9014.

### I. STATEMENT OF THE ISSUE

The issue I must resolve poses the question of the extent, if any, to which profits generated postpetition from the sole proprietorship of an individual Chapter 11 debtor are excluded from property of the estate by the earnings exception of 11 U.S.C. § 541(a)(6). I am asked to separate, if necessary, the postpetition income stream of an individual debtor into profits generated from property of the estate and earnings from the debtor's services.

### II. FACTUAL BACKGROUND

The debtor, Dr. Denton A. Cooley, is without dispute one of the most famous heart surgeons in the world. His reputation in the medical field is unsurpassed nationally and internationally. Dr. Cooley, like many other prominent citizens of the

State of Texas, is the unfortunate victim of a depressed regional economy. As a consequence, Dr. Cooley filed for relief under Chapter 11 of the Bankruptcy Code on January 4, 1988. With his petition, Dr. Cooley filed a disclosure statement and a Chapter 11 plan, subsequently amended, manifesting his intent to liquidate his estate over the life of the plan rather than attempt to reorganize his various business interests.

Although Dr. Cooley's investment interests (primarily real estate and oil and gas) are numerous, the principal source of his prepetition as well as postpetition income is derived from his medical practice which he operates as a sole proprietor under the professional name Cardiovascular Associates ("CVA"). CVA employs approximately 25 people including four surgeons on direct contract with CVA. A fifth surgeon, who is employed by the University of Texas Medical School but whose salary in part is reimbursed by CVA, performs essentially the same cardiovascular surgeries as do the other four surgeons. Dr. Cooley has neither assumed or rejected the personal service contracts between CVA and the five associate surgeons, and their employment contracts will expire June 30, 1988. The associate surgeons continue to perform postpetition under their service contracts as they did prepetition, generating postpetition income. For the most part, the associate surgeons perform surgical procedures similar to those of Dr. Cooley, though the more challenging surgeries are often left to him. Dr. Cooley and the associate surgeons in his employ are all board certified in cardiovascular, thoracic and general surgery. Both Dr. Cooley and the associate surgeons are assisted by resident cardiovascular surgeons under the employ of St. Lukes, who often open and close and perform the less intricate procedures. The associate surgeons at times assist or collaborate with Dr. Cooley in performing certain surgeries.

Although Dr. Cooley and the associate surgeons generally conduct similar surgical procedures, significant differences exist in their relative contributions towards the earnings generated by the medical practice. Dr. Cooley is indisputably a "rainmaker" in his profession. It is his reputation and his personal referral network on a local, national, and international level among cardiologists and other physicians which cultivates a continuous patient pool for CVA. The associate surgeons do generate referrals of their own, receiving bonuses for such referrals; nevertheless, a significant number of their referrals derive from Dr. Cooley's referral network. Dr. Cooley takes an active management role in the day-to-day business affairs of CVA. Although Dr. Cooley employs a business manager, he himself performs or delegates to persons other than the associate doctors all management functions of CVA. The associate surgeons do not. With respect to his role as to surgical matters, Dr. Cooley screens incoming patients, selecting the appropriate surgeon that the patient's particular diagnosis necessitates. In addition to these and numerous other contributions not expected of the associate surgeons, Dr. Cooley also was responsible for approximately 41 percent of all surgeries performed in 1987, resulting in approximately 48 percent of the net receipts collected by CVA. In sum, Dr. Cooley's contributions towards the earnings generated by his medical practice in 1987 far outweighed the collective contributions of the five associate surgeons.

Dr. Cooley and the five associate surgeons conduct their operations at St. Luke's Episcopal Hospital ("St. Luke's). St. Luke's provides without charge offices, operating rooms, and surgical support teams. In return, St. Luke's receives a significant return from its association with Dr. Cooley and his medical practice. If Dr. Cooley were affiliated with another hospital, St. Luke's would undoubtedly lose a significant source of revenue. The net economic benefits attributable to the relationship redound in favor of St. Luke's rather than Dr. Cooley.

CVA's financial data for the fiscal year 1987 most accurately reflects the accounting information necessary to resolve the issue of what constitutes property of Dr. Cooley and what constitutes property of the estate. The net receipts collected (total

patient billings less uncollectibles) totaled $14,705,029. Of this amount, the associate surgeons generated $7,631,033 through surgeries they performed; the remaining $7,073,996 is attributable to surgeries Dr. Cooley performed. After operating expenses of $4,957,430, which include payment of the associate doctors' salaries, the income from CVA Dr. Cooley reported on his 1987 tax return totaled $9,747,599. Of this amount, the earnings attributable to operations the associate surgeons performed amounted to $3,403,315.

The formula for compensating the associate surgeons is relevant to this decision since the most potentially lucrative compensation formula was applied to Dr. Cooley and offered by First City as evidence of the value of the earnings attributable to the services performed by Dr. Cooley. The compensation paid to all associate surgeons is based on a fixed salary and an incentive bonus. The contract of the most highly paid associate surgeon, (Dr. A, to protect his anonymity), provides for an annual salary of $250,000. His bonus is determined by reference to the net receipts collected from patients admitted to the hospital, operated on, and billed under his name (direct admits). The net receipts collected from referral patients, those patients Dr. A operates on but was not responsible for admitting, are not factors in calculating Dr. A's bonus. As a bonus, Dr. A receives 60 percent of the first $750,000 in net receipts collected attributable to his direct admits and 25 percent in excess of $750,000.

First City's expert, after including all net receipts collected from patients Dr. Cooley operated on whether attributable to direct admits or referrals ($7,073,996), applied Dr. A's compensation formula and concluded that earnings attributable to Dr. Cooley's medical practice for 1987 was $2,280,999. This amount would constitute 23.4 percent of the income from Dr. Cooley's medical practice for 1987. First City would apply this percentage to the postpetition income stream from Dr. Cooley's medical practice as the value of earnings attributable to Dr. Cooley's services, which as such would constitute property of the debtor. All other income generated by the medical practice according to First City would constitute property of the estate.

In addition to valuing the income producing component designated as the services of Dr. Cooley, First City also segregated and valued the 1987 income of the medical practice on the basis of three other components or assets. The largest income generating component, the services of the associate surgeons, as noted previously, was valued based upon the earnings' attributable to operations performed by the associate surgeons ($3,403,315). The smallest income producing asset, the invested capital is composed of cash ($818,872), accounts receivable ($6,905,535), and fixed assets ($149,482). A 12 percent return to the estate for any portion of the invested capital component which generates or has generated postpetition income to the medical practice was argued as a fair return, and I am in agreement. The remaining income producing component, goodwill, was valued on a residual basis and was calculated by First City as $3,201,285.

### III. DISCUSSION OF APPLICABLE LAW

When an individual petitions for relief under a chapter of the Bankruptcy Code, an estate is created. 11 U.S.C. § 541 defines which property will pass to the estate. Section 541 applies invariably to each chapter an individual is eligible under unless the specific chapter invoked dictates a different result. 11 U.S.C. § 103(a). The initial pool of property interests which forms an estate is determined by Section 541(a)(1) and (a)(2) as limited or otherwise affected by the provisions of Section 541(b), (c), and (d). This initial composition of property interests which form the estate may be enlarged to include property accruing subsequent to the commencement of the case by operation of Sections 541(a)(3) through (a)(7). The issue before me concerns the extent to which Section 541(a)(6) expands upon the initial composition of the estate as constituted by Section 541(a)(1).

Section 541(a)(1) includes as property of the estate "all legal or equitable

interests of the debtor in property as of the commencement of the case." Although the wording of Section 541(a)(1) evidences an intent to broadly construe the term property of the estate, its scope is limited by its language to property interests the debtor holds as of the petition date. In the absence of conflict with federal policies underlying bankruptcy law, whether a debtor possesses an interest in property is governed by state law. *In re Roach,* 824 F.2d 1370 (3rd Cir.1987). Once it is determined that debtor possesses an interest in property recognized under state law, bankruptcy law controls exclusively whether such interest becomes property of the estate, *Goff v. Taylor (In re Goff),* 706 F.2d 574 (5th Cir.1983).

Property of the estate as initially constituted under Section 541(a)(1), or as expanded by a provision other than Section 541(a)(6), includes property which accrues from property of the estate in the form of "[p]roceeds, product, offspring, rents or profits." 11 U.S.C. § 541(a)(6). This general rule of inclusion of the above accruals as property of the estate is subject to an important exception for "earnings from services performed by an individual debtor after the commencement of the case." *Id.*

In the case of an individual debtor with earnings from services, the interplay between Section 541(a)(1) and (a)(6) creates, in substance if not in legal form, two estates as of the commencement of the case. One consists of property of the estate while the other consists of property of the debtor. This result follows from the fact that an individual debtor and his estate are separate entities. *Koch v. Myrvold (In re Myrvold )* 44 B.R. 202, 204 (Bankr.D.Minn. 1984), *aff'd.* 784 F.2d 862 (8th Cir.1986).

The fact that the individual debtor chooses to file under Chapter 11 and assume the fiduciary role of debtor-in-possession does not change this result. Congress has made no distinction between the scope and application of Section 541(a)(6) in a Chapter 7 case and its scope and application in a Chapter 11 case. This stands in sharp contrast to Chapter 13.

When Section 541(a)(6) is compared and contrasted with the expanded definition of property of the estate under Chapter 13, it becomes evident that Congress was cognizant of the underlying policy considerations behind the earnings exception. After weighing these considerations, Congress chose to eliminate the earnings exception in Chapter 13, and property of the estate is defined there to include a Chapter 13 debtor's postpetition earnings from services. *See* 11 U.S.C. § 1306(a). In contrast, Congress chose not to limit in any manner the earnings exception as it applies to an individual under Chapter 11, whether protection is invoked through a voluntary or involuntary petition, or whether debtor seeks to reorganize or liquidate. An examination of the policy concerns reflected by the dichotomous treatment of earnings in the two reorganization chapters sheds light on the interpretation and the scope of the earnings exception.

Although the Congressional Record is bare of any significant discussion addressing the earnings exception, the considerations can be gleaned from policy concerns voiced with respect to Chapter 13. The first such consideration expressed is the prohibition against involuntary servitude. *See In re Noonan,* 17 B.R. 793, 800 (Bankr. S.N.Y.1982); *Citing* H.R.Rep. No. 595, 95th Cong., 1st Sess. 322, *reprinted in* 1978 U.S.Code Cong.Admin.News 5963, 6278; S.Rep. No. 989, 95th Cong., 2d Sess., 94, *reprinted in* 1978 U.S.Code Cong and Admin.News 5787, 5880. Congress forcefully expressed its concern with the potential conflict with the Thirteenth Amendment's prohibition against involuntary servitude by mandating that Chapter 13 be strictly voluntary. The inclusion of a Chapter 13 debtor's postpetition earnings from services as property of the estate undoubtedly is at the heart of this concern. The insistence that this inclusion be voluntary represents an attempt by Congress to avoid any constitutional conflict. That concern carries over and is addressed by the earnings exception of Section 541(a)(6). The potential otherwise exists that an individual may be subjected to an involuntary bankruptcy under Chapter 7 or Chapter 11

and his earnings included in his estate. *See* 11 U.S.C. § 303(a).

Congress chose not to eliminate the earnings exception with respect to an individual who files a voluntary Chapter 11 petition, in my opinion, to protect against creditors impressing an individual debtor to work for the estate, as well as to protect an individual Chapter 11 debtor's right to a fresh start. *Powell v. U.S. Cartridge Co.*, 339 U.S. 497, 70 S.Ct. 755, 94 L.Ed. 1017 (1950); *Local Loan Co. v. Hunt*, 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230 (1934). The interplay between Section 541(a)(1) and (a)(6) demonstrates an intent to protect the individual debtor's right to a fresh start *as of the commencement of the case*, not as of the time of discharge or when the plan is confirmed, administered or consummated. This policy of protecting an individual debtor's right to a fresh start is particularly clear where an individual manifests an intent to liquidate his estate through a Chapter 11 plan. The right of an individual to file under Chapter 11 with the intent to propose a liquidating plan is unassailable, subject, of course, to the constraints imposed by the Code. *See* 11 U.S.C. § 1123(b)(4); 11 U.S.C. § 1129; 11 U.S.C. § 1141(d)(3).

Under the Bankruptcy Act, the predecessor to the Bankruptcy Code, "after acquired property" not specifically included as property of the estate by operation of its provisions generally accrued to debtor free of prepetition claims. *Segal v. Rochelle* 382 U.S. 375, 86 S.Ct. 511, 15 L.Ed.2d 428 (1966). Wages, compensation or earnings accruing to an individual debtor after adjudication were held unquestionably to be property of the debtor rather than property of the estate. *Sporleder v. Swaine (In re Sporleder)* 456 F.2d at 1082; *Hudson v. Wylie*, 242 F.2d 435 (9th Cir.), *cert. denied*, 355 U.S. 828, 78 S.Ct. 39, 2 L.Ed.2d 41 (1957); *McKeever v. Local Finance Co.*, 80 F.2d 449, 452 (5th Cir.1935). Under the Act, earnings actually accruing postpetition had to be distinguished from earnings accruing prepetition, but which came into the debtor's possession postpetition. A narrow exception was created for a portion of such earnings, which although "sufficiently

rooted in the prebankruptcy past," were nevertheless excluded from property of the estate because of their necessity to "the bankrupt's ability to make an unencumbered fresh start." *Segel v. Rochelle*, 382 U.S. 375, 380, 86 S.Ct. 511, 515, 15 L.Ed.2d 428 (1966); *Lines v. Frederick*, 400 U.S. 18, 91 S.Ct. 113, 27 L.Ed.2d 124 (1970).

The enactment of the Bankruptcy Code with Section 541's definition of property of the estate specifically overruled this narrow exception for earnings accruing prepetition but held necessary for the individual debtor's fresh start. 11 U.S.C. 541(a)(1); S.Rep. No. 989, 95th Cong., 2d Sess. 82, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5868. The general rule that earnings of an individual debtor actually accruing postpetition do not comprise any portion of property of the estate remains viable. The elimination of the fresh start exception applicable to earnings which accrue prepetition and the narrowness of that exception cannot be used to interpret Section 541(a)(6) since the earnings exception by its language applies only to earnings which accrue after the commencement of the case.

Case law interpreting the earnings exception of Section 541(a)(6) has largely revolved around the only Circuit Court to have reached the issue. Both First City and debtor discussed at length in their arguments the Ninth Circuit opinion in *FitzSimmons v. Walsh, (In re FitzSimmons )*, 725 F.2d 1208 (9th Cir.1984). The pertinent facts in *FitzSimmons* are straightforward. The debtor was an attorney who operated his law practice as a sole proprietor employing other attorneys as well as support staff. He filed under Chapter 11 with the intent to reorganize his practice. The Bankruptcy Court appointed a Chapter 11 trustee to operate the business and permitted FitzSimmons to draw a predetermined monthly amount as salary, with all remaining earnings accruing to the estate. The debtor argued that all earnings from his practice were his property by virtue of the earnings exception. The Chapter 11 trustee argued that FitzSimmons was entitled only to whatever salary

the trustee or Bankruptcy Court deemed appropriate.

The Ninth Circuit adopted a middle position. It rejected the trustee's argument that the debtor was entitled only to whatever salary the trustee or Bankruptcy Court deemed appropriate since there was no evidentiary connection between the proffered salary amount and the services personally rendered by the debtor. With respect to the debtor's claim that all earnings from his law practice accrued to his benefit, the Ninth Circuit held that the earnings exception operated to exclude only those earnings attributable to services "personally" performed by the debtor. *Id.* at 1211. As to those earnings of the sole proprietorship "attributable not to FitzSimmons' personal services but to the business invested capital, accounts receivable, goodwill, employment contracts with the firm's staff, client relationships, fee agreements, or the like, the earnings of the law practice accrue[d] to the estate." *Id.* The Ninth Circuit then remanded the case to the bankruptcy court to determine the "value" of that "portion of the law practice's earnings that were attributable to FitzSimmons personal efforts" in order to exclude that amount from the bankruptcy estate. *Id.* at 1212.

In interpreting the scope of Section 541(a)(6), the Ninth Circuit in effect interlineated the word "personally" into the language of the earnings exception, which as a consequence would read "earnings from services [personally] performed by an individual debtor after the commencement of the case." *Id.* (Brackets added). The Court in *FitzSimmons* derived support for its statutory construction by resorting to a functional analysis of Chapter 11 as well as a statutory analysis of Section 541(a)(6). With respect to its functional analysis of Chapter 11, the Court reasoned that construing the earnings exception broadly to exclude from the estate all earnings from a sole proprietorship would "seriously interfere with the continued operation of a sole proprietorship during the course of a Chapter 11 case." *Id.* As additional policy support, the Court contrasted the treatment of earnings from a corporation or a partnership which accrue for the benefit of the estate with the treatment which would result if a debtor were allowed to retain all earnings from a sole proprietorship, concluding that Congress did not intend such an anomalous result. With respect to the statutory analysis offered as support for its construction, the Court relied upon the use by the drafters of the word "individual" to buttress its contention that the plain meaning of Section 541(a)(6) requires an engraftment of the more constrictive modifier "personally" into the language embodying the earnings exception.

I am troubled by the Ninth Circuit's interpretation of the earnings exception. I find its rationale for judicially engrafting the more restrictive term "personally" into the statute unpersuasive as well as unfaithful to the directives of Section 541. I also believe that a valuation of an individual's personal services is neither mandated under Section 541 nor practicable. For the reasons which follow I am convinced it is incumbent upon a creditor as movant to demonstrate those property interests which as property of the estate generate additional Section 541(a)(6) property accruable to the estate.

Congress was well aware of the distinction between an individual, corporate and partnership debtor. 11 U.S.C. § 101(35). Congress was also aware of the distinction between an individual and a business organized as a sole proprietorship. *See Fitz-Simmons v. Walsh*, 725 F.2d at 1211; *In re Noonan*, 17 B.R. at 799. Congress chose not to create separate debtor entities for an individual and his sole proprietorship. The Ninth Circuit intimates that such a cleavage must be effected to avoid the detriment which would otherwise result to creditors who "would not enjoy the profits earned by a sole proprietorship operated under Chapter 11." *FitzSimmons v. Walsh*, 725 F.2d at 1211. I am of the opinion that Section 541(a)(6) addresses that concern without addition to its statutory language and without valuation by a comparative or other compensatory formula of an individual's services towards the earnings of a sole proprietorship. The

earnings exception was not drafted in terms of "reasonable compensation" of an individual's services or in terms of "services *personally* performed" which might have suggested a directive towards valuing an individual's "hands-on" contributions in the form of services. It was not drafted in terms of wages or salaries. It uses the broad, encompassing term "earnings."

Congress's use of the term "individual" in the earnings exception was not to distinguish between the individual and the sole proprietorship, but to distinguish between an individual on the one hand and a corporation or partnership on the other. Its concern, as illustrated by the legislative history of Chapter 13, was to avoid any conflict with the Thirteenth Amendment's prohibition against involuntary servitude. A corporation or partnership, though protectable under the Bankruptcy Code, are not protectable entities under the Thirteenth Amendment and its provision barring involuntary servitude. *Slaughter House Cases*, 83 U.S. 69, 16 Wall 69, 21 L.Ed. 394 (1872) ("involuntary" as used in the Thirteenth Amendment can only apply to human beings). I am also convinced that Congress's use of the phrase "after the commencement of the case" in the earnings exception was to mark that point in time when an individual's right to a fresh start would become effective.

As I have noted an individual debtor's right to a fresh start comes into play as of the commencement of the case and is particularly important where the debtor contemplates liquidation rather than reorganization. The Ninth Circuit in *FitzSimmons* relied heavily on the fact that the debtor before it contemplated reorganization rather than liquidation. Although the application and interpretation of Section 541(a)(6) should not vary because of an individual's choice to reorganize or liquidate under Chapter 11, the Ninth Circuit's reliance on the reorganization principle to interpret narrowly the earnings exception necessitates consideration of the effect of liquidation and the right to a fresh start on the scope of the exception. If the earnings exception applies invariably to every case whether the debtor contemplates reorganization under Chapter 11, or liquidation under Chapter 11 or Chapter 7, then both policies must be considered and balanced in determining the encompassing scope of the exception.

Under the Bankruptcy Act, an exception existed to the rule that "after acquired" property not specifically included as property of the estate belonged solely to the debtor. The distinction was drawn with respect to "after acquired" property of a debtor attempting to reorganize rather than liquidate under the Act: "where the trustee or debtor-in-possession of a going business receives income while engaged in an effort to preserve the going concern value of the enterprise, such receipts do not fall outside the trust imposed by the Act merely because they constitute after acquired property." 4A *Collier on Bankruptcy* Paragraph 70.09 at 109 (14th Ed. 1975); Bankr.Act, § 70(a) (11 U.S.C. 110(a)) (repealed 1978); *see also United States v. Paul Hardeman*, 260 F.Supp. 723 (M.D. Fla.1966); *In re Richter*, 40 F.Supp. 758 (S.D.N.Y.1941). Although Section 541(a)(6) fails to distinguish between a liquidating as opposed to a reorganizing individual debtor, under the Bankruptcy Act, the concept of property of the estate was broadened in the context of reorganization to include property which would not be included in the context of liquidation. This suggests that if the scope of the earnings exception is to vary on the basis of whether reorganization under Chapter 11 or liquidation under Chapter 7 or Chapter 11 is contemplated, the fact that liquidation is contemplated would broaden its scope. If the scope of the earnings exception is constant in the context of either reorganization or liquidation then both the policy of protecting the right of an individual liquidating debtor to a fresh start and protecting the going concern value of reorganizing debtor must be balanced in interpreting the earnings exception.

I believe Section 541(a)(6) directs that the "[P]roceeds, product, offspring, rents or profits" derived from those assets or other property interests of a sole proprietorship which either originally pass to the estate

under Section 541(a)(1) or (a)(2) or subsequently accrue to the estate under Sections 541(a)(3) through (a)(7) become property of the estate by operation of Section 541(a)(6). To the extent that the Ninth Circuit in *FitzSimmons* focused on those Section 541(a)(1) property interests which generated Section 541(a)(6) postpetition "profits," namely the business invested capital, accounts receivable, goodwill, employment contracts, etc., I concur in its analytical approach. To the extent that it requires a valuation of an individual's personal or "hands-on" services, I cannot concur. The earnings exception does not by its language direct that I conduct a valuation hearing to ascertain that portion of the postpetition income stream of a sole proprietorship attributable to the personal services of an individual debtor. I cannot agree with First City or the Ninth Circuit that I must value the personal services of Dr. Cooley with *all* remaining earnings accruing to the estate without proof that such earnings are in fact "profits" from property of the estate. Instead, I hold that once the debtor has met his burden of going forward with evidence to show that under the earnings exception: (1) the debtor is an individual, (2) who performs services, (3) which generates earnings, (4) postpetition, the burden of proof rests upon the creditor as movant to show that the purported individual debtor's earnings are in actuality "[p]roceeds, product, offspring, rents [or] profits" derived from those assets or other property interests which have previously accrued to the estate by operation of Section 541. This approach seems best to guard against the potential conflict with the prohibition against involuntary servitude and to ensure protection of an individual's fresh start. I am also convinced that such an approach is more faithful to the plain meaning of Section 541(a)(6).

## IV. APPLICATION OF THE LAW TO THE FACTS

Dr. Cooley has met his burden of coming forward with prima facie evidence to show that the earnings from his medical practice fall within the earnings exception. First City must therefore meet its burden of proof that instead of earnings from services such accruals are "profits" derived from property of the estate. To meet its burden, First City must prove the extent to which Section 541(a)(1) assets or property interests contribute to the postpetition income stream of Dr. Cooley's medical practice.

In determining what property interests accrued to the estate as of the commencement of Dr. Cooley's bankruptcy case, I am guided but not bound by Texas law. The property interests from which the income of a sole proprietorship is derived as well as the income itself are clearly recognizable property interests under state law. Both sides agree that the prepetition earnings of Dr. Cooley's medical practice in the form of cash and accounts receivable on hand as of the commencement of the case vest in the estate. If the prepetition earnings from Dr. Cooley's medical practice are recognizable property interests under Texas law and thus property of the estate, it follows that the postpetition earnings are recognizable property interests under state law. Whether such postpetition earnings accrue to the estate or to the debtor is governed solely by bankruptcy law.

First City's expert identified four components or assets which as of the commencement of the case generated the postpetition income stream of Dr. Cooley's medical practice: (1) the personal services performed by Dr. Cooley; (2) invested capital; (3) goodwill; and (4) the personal services performed by the associate surgeons.

### A. *The Personal Services Performed By Dr. Cooley*

With respect to the first component—the services performed by Dr. Cooley—I reject First City's attempt under Section 541(a)(6) and *FitzSimmons* to determine the dollar amount which reasonably compensates Dr. Cooley for the services he personally performs in generating the earnings of his medical practice. As I have already discussed, I do not interpret Section 541(a)(6) as requiring that I value Dr. Cooley's personal services in order to derive an amount which reasonably compensates Dr. Cooley for his services. This case well illustrates the difficulty of at-

tempting to determine precisely what services Dr. Cooley personally performs since so many other individuals and entities are intimately involved from beginning to end in the daily operations he himself performs.

Even if I were to accept First City's premise that I must value the personal "hands-on" services of Dr. Cooley, I could not accept the methodology employed by First City to calculate the earnings attributable to Dr. Cooley's services. From the evidence presented, I find that applying the compensation formula of the associate surgeon, Dr. A, to Dr. Cooley does not adequately value the personal "hands-on" services of Dr. Cooley. Their reputations, referral networks, management functions, and other tangible and intangible contributions and responsibilities differ so greatly as to render the use of Dr. A's formula inappropriate. In fact, when the above factors of all five associate surgeons employed by CVA are compared with those of Dr. Cooley, Dr. Cooley's contributions in all probability exceed their combined contributions.

### B. *The Invested Capital Component*

■ The invested capital of CVA as of the commencement of the case consisted of cash, accounts receivable and fixed assets. Debtor has conceded that these assets are property of the estate and to the extent they generate postpetition profits, the estate is entitled to the return on its investment at a 12 percent interest rate. Dr. Cooley does dispute the contention of First City that the invested capital continues to generate postpetition returns. He argues that since the only assets that are being used postpetition to generate postpetition earnings are the fixed assets, the estate should be limited to a return on those assets.

I agree with debtor's argument. The accounts receivable and the cash have either been segregated or, to the extent debtor is employing such assets postpetition, interest is being paid in accordance with a temporary postpetition financing arrangement. To factor a return to the estate for the cash and accounts receivables already segregated for the benefit of the estate's

creditors would allow the creditors the benefit of a return on such assets without debtor's postpetition use. No doubt the prepetition cash not subject to the financing arrangement is generating a return to the estate in the form of interest which represents "proceeds" or "profits" from property of the estate. The receivables upon their liquidation into cash also are accruing interest upon deposit into interest-bearing accounts. To allow an additional return to the estate for property of the estate which is not being employed to generate Dr. Cooley's postpetition service earnings would amount to a gratuitous and unearned double return to the estate. I hold that since the fixed assets are the only property interests from the invested capital component which are employed in generating the postpetition income stream of Dr. Cooley's medical practice, only the 12 percent return on the investment of those assets ($149,000) shall be factored in to determine the percentage of the postpetition income stream accruing to the estate.

### C. *The Goodwill Component*

■ With respect to the goodwill component which First City alleges comprises an asset which generates profits accruable to the estate, I hold that First City has failed to demonstrate that any portion of the amount its expert calculated as goodwill represents business as opposed to personal goodwill. Although I am not bound by any precedent established under Texas law regarding this distinction, I am persuaded that personal goodwill can be and is generally distinguishable from business goodwill. *Nail v. Nail*, 486 S.W.2d 761, 764 (Tex.1972) (goodwill of physician did not possess value or constitute an asset separate and apart from the individual); *Geesbreght v. Geesbreght*, 570 S.W.2d 427, 435 (Tex.Civ.App. Ft. Worth 1978 writ dism'd.) (difference exists in terms of the personal goodwill of an individual and goodwill of a business). The experts from both sides agreed that there exists a generally recognized distinction between personal and business goodwill.

Even under *FitzSimmons*, the Ninth Circuit specifically referred only to business

goodwill as property of the estate which generated a portion of the postpetition profits of the debtor's sole proprietorship. *FitzSimmons v. Walsh*, 725 F.2d at 1211. Were I to engage in a valuation of the earnings from Dr. Cooley's personal services with all residual postpetition earnings from CVA accruing to the estate, I would nevertheless hold that his personal goodwill is inextricably bound up with his personal services and is not by operation of the earnings exception property of the estate. Dr. Cooley's personal goodwill is of the same nature as his medical degree and license to practice medicine which although arguably property under state law, are nonetheless inextricably bound up with his postpetition services. *See Ryan v. Lynn (In re Lynn)*, 18 B.R. 501 (Bankr.D.Conn. 1982) (In light of the earnings exception, debtor's medical degree and license are not property of the estate for purposes of bankruptcy law).

First City has failed to distinguish in any fashion between personal as opposed to business goodwill. Instead, it calculated the overall goodwill of the medical practice as a residual after the other three income generating components were projected. Having rejected First City's valuation approach to interpreting the earnings exception as well as its methodology for determining the value of the personal services performed by Dr. Cooley, support for its residual valuation of goodwill becomes untenable.

It is difficult to view the goodwill attributable to the medical practice as anything but the personal goodwill of Dr. Cooley and to some degree the goodwill of the associate surgeons. Without the extensive services and association of Dr. Cooley and to a lesser extent the associate surgeons, CVA would possess little if any value beyond the value of the fixed assets. Experts from both sides essentially stated this. Between the associate surgeons and Dr. Cooley it is apparent that their association with Dr. Cooley, and all that such association entails in terms of his reputation, referral network, services and experience, remains dependent, if only by choice, upon the presence and personal goodwill of Dr. Cooley.

### D. The Personal Services of the Associate Surgeons.

■ Turning to the next factor—the services of the associate surgeons—I hold that the postpetition income derived from such services accrues to the estate as "profits" from property of the estate under Section 541(a)(6) rather than to Dr. Cooley as earnings from services performed by Dr. Cooley. With respect to this issue, I am persuaded that First City has proffered sufficient evidence to meet its burden of proof.

■ As intimated previously, I view the term "services" as used in the earnings exception as more encompassing than the term "personal services" or its equivalent under *FitzSimmons* "services personally performed." Although I am not bound by Texas law on this point of interpretation, as counsel for debtor has disingenuously asserted, I do find support in case law which has addressed the differing scope of the two terms. *Van Zandt v. Fort Worth Press*, 359 S.W.2d 893, 895 (Tex.1962). *Clark Advertising Agency v. Tice*, 490 F.2d 834, 838 (5th Cir.1974). In the cases cited above the terms "services" and "personal services" were distinguished in that "services" encompassed the efforts of an individual's employees while "personal services" extended only to the individual efforts of the person. As I discussed earlier, I am not willing to interlineate the term "personally" into the earnings exception, which I believe would effect a change in the statute identical to the use of "personal services" in place of "services." Interpreting "services" to include all the labor of the employees of a sole proprietorship on the otherhand, would equally be at odds with the language of the statute and the interplay between Section 541(a)(1) and (a)(6). There is a middle ground between these two extremes, at least with respect to the case before me. Those employees of a sole proprietorship who without the association and services of the individual debtor would not generate income to the sole proprietorship on their own behalf fall within the scope of the term "services"; the employees of a sole proprietorship who do gener-

ate income from a primary rather than a supportive role fall outside the scope of the term "services" as used in the earnings exception.

The five associate surgeons when compared to the twenty or so other employees of the medical practice stand in a primary income producing role. Their role is independent and severable as opposed to the ancillary support function performed by the other employees. The associate surgeons perform similar and often identical operations to the operations performed by Dr. Cooley. They are supported by those employees and non-employees in support roles to a degree similar to that of Dr. Cooley. They generate income directly without the direct services of Dr. Cooley. To some extent their reputations and referral networks contribute towards the goodwill of the medical practice, though to a far lesser degree than that of Dr. Cooley. Most importantly, their personal services were an asset or interest in property which as of the commencement of the case became property of the estate. As property of the estate, any profits derived from their services, so long as they are affiliated with the estate, accrue to the benefit of the estate and its creditors.

█ Dr. Cooley has argued that since the associate doctors' employment contracts have not been assumed by him acting in his role as debtor-in-possession, they are not property of the estate. *See Tonry v. Herbert (In re Tonry)* 724 F.2d 467, 469 (5th Cir.1984) (". . . interest in an executory contract does not automatically vest in the bankruptcy estate at the time of filing.") Based on this premise, he further argues that because the contracts are not property of the estate any income derived from services of the associate surgeons cannot be "profits" from property of the estate under Section 541(a)(6). I focus not on their contracts but on the services they are continuing to render which continue to generate postpetition income. Such income accrues to either the estate or to Dr. Cooley. I believe it would be inequitable to allow the debtor to control by the decision to withhold assumption of these contracts whether the income attributable to the doctors' services accrues to himself or to the estate. Dr. Cooley as debtor-in-possession acts as a fiduciary for the estate on behalf of the creditors of the estate. As a fiduciary he is accountable for those actions which unjustifiably redound to the detriment of the creditors' interests.

Dr. Cooley, furthermore, has manifested his intent to assume the contracts of the associate surgeons through confirmation of the plan. At that time, such contracts will be property of the estate. This result could afford another legal basis for concluding that any income attributable to the services of the associate surgeons while affiliated with the estate accrues to the estate since it might be justifiable to hold that the act of assuming such contracts, at least for the purposes of the income derived therefrom, relates back to the commencement of the case. At this point the contracts are not at issue only the income derived from the postpetition services of the associate surgeons and to whose benefit such income accrues.

█ As a final argument, Dr. Cooley has also argued that I may not decide this issue without the proper joinder of the associate surgeons. He argues that they are "necessary" and "indispensable" parties under Rule 19 of the Federal Rules of Civil Procedure. I reject this argument since my decision in no way interferes with their rights under Section 365 to bar assumption of their personal service contracts nor affects the terms of their contracts in any manner. My decision with respect to this issue focuses solely on the income derived from their services not on the contracts themselves. For the above reasons, I hold that income attributable to the services of the associate surgeons ($3,403,315) must be included in deciding upon an appropriate percentage figure to be applied to the postpetition income stream from Dr. Cooley's medical practice.

## V. CONCLUSION

█ Two identifiable sources of the postpetition income stream are derived from property of the estate which under Section 541(a)(6) generates "profits" for

the benefit of the estate: (1) fixed assets, and (2) services performed by the associate surgeons. The income generated in 1987 from these two components amounts to $18,938 (12% $\times$ $149,482) and $3,403,315 respectively. The sum of these two values when divided by the 1987 income from Dr. Cooley's medical practice ($9,747,599) gives an approximate percentage to be applied to all postpetition income in order to determine the amounts accruing to the estate. The above calculation leads to a percentage of 35.1 ($3,422,253/$9,747,599). This figure is based on financial data from 1987, and it is at best a rough approximation of what the actual postpetition income flow will yield to either the estate or to Dr. Cooley based on the above analysis. The actual postpetition financial data may be employed to arrive at amounts more reflective of actual "profits" and "earnings" under Section 541(a)(6). The contracts between CVA and the associate doctors are to expire by their own terms June 30, 1988. I do not reach the issue of what affect, if any, the expiration of these contracts might have on any issues in Dr. Cooley's case.

It is therefore ORDERED that the amount of such postpetition profits as calculated by the percentage determined above shall constitute property of the estate and shall be dealt with by the debtor accordingly.