**In re JOHN A. RUMKER, Debtor.**

**Bankruptcy No. 95–50207.**

United States Bankruptcy Court,
S.D. Georgia,
Savannah Division.

July 24, 1995.

Richard M. Nichols, Douglas, GA, for debtor.

William L. Thompson, Douglas, GA, for movant.

Sylvia F. Brown, Chapter 13 Trustee, Savannah, GA.

## MEMORANDUM OPINION

JAMES D. WALKER, Jr., Bankruptcy Judge.

This matter comes before the Court on Motion for Reconsideration filed by Coffee County Bank ("Movant"). A hearing was originally held in this matter on April 25, 1995. This is a core matter under 28 U.S.C. § 157(b)(2)(K). For the following reasons, the Court will deny reconsideration of its previous order. These findings of fact and conclusions of law are entered pursuant to Fed.R.Bankr.P. 7052.

## FINDINGS OF FACT

John A. Rumker ("Debtor") is an attorney engaged in the private practice of law as a solo practitioner. Debtor relies upon his individual labors to maintain his law practice as a going business concern. He filed this Chapter 13 petition on April 10, 1995. The relevant facts of this case are not in dispute.

Movant and Debtor entered into a pre-bankruptcy line of credit agreement whereby Movant provided Debtor with a maximum line of credit of approximately Thirty Thousand Dollars ($30,000.00). In exchange, Debtor executed a promissory note in the same amount as well as a security agreement. The security agreement provided in part:

**Security Interest.** To secure the payment and performance of the above described Secured Debts, liabilities and obligations, I give you a security interest in all of the property described below that I now own and that I may own in the future (including but not limited to, all parts, accessories, repairs, improvements, and accessions to

the property), wherever the property is or may be located, and all proceeds and products from the property.

**The secured property includes, but is not limited by, the following:** All furniture, fixtures, equipment and accounts receivable included in but not limited to the attached exhibit A wether [sic] now or hereafter acquired and used in the operation of a law practice located in Coffee County, Georgia.

Movant states, and Debtor does not contest, that Movant entered into the credit agreement with Debtor in anticipation of Debtor entering into an employment contract with Coffee County, Georgia. The employment contract was made, and it obligated Debtor to provide legal representation to one-third of the indigent criminal defendants in various state trial courts in Coffee County between August 1, 1993, and December 31, 1994. Debtor was to receive Two Thousand Eighty-three Dollars and Thirty-four Cents ($2,083.34) per month in exchange for his services. Although Movant argues that the contract for employment between Debtor and Coffee County was the basis for the line of credit agreement, the loan documents do not refer to the contract for employment and are not conditioned upon Debtor obtaining employment with Coffee County.

After Debtor entered into the contract with Coffee County he drew upon the line of credit provided by Movant. Movant claims that Debtor owes a total of Twenty-five Thousand Six Hundred Thirty-two Dollars and Thirty-five Cents ($25,632.35) under the loan agreement.

Debtor thereafter entered into a second contract with Coffee County to provide the same legal services as previously contracted during the period between January 1, 1995, and December 31, 1995. Under the second contract, Debtor receives Two Thousand Three Hundred Thirty-three Dollars and Thirty-four Cents ($2,333.34) per month as consideration for his legal services.

Debtor defaulted under the loan agreement and Movant proceeded to notify Coffee County that because of its interest in Debtor's accounts receivable, Coffee County should make all future payments under Debtor's employment contract to Movant. Movant claims that it received one payment from Coffee County before Debtor filed for bankruptcy protection.

Movant seeks to assert a security interest in Debtor's unearned post-petition compensation under the Coffee County employment contract as well as any other executory contracts for legal services which existed at the time of the bankruptcy filing.[1] At the original hearing on this matter, Movant sought an order from this Court directing Debtor to segregate and account for all of Movant's claimed cash collateral.[2] Movant claimed that any post-petition funds earned by Debtor under the pre-petition employment contract constituted proceeds of accounts receivable, and therefore were subject to Movant's security interest. The Court found that Movant's security interest extended to amounts payable for services rendered by Debtor pre-petition, but not to services which were contracted for pre-petition and unperformed as of the petition date.

### CONCLUSIONS OF LAW

The issue before the Court is whether a creditor may assert a security interest in a debtor's post-petition income or salary payable pursuant to a pre-petition contract for employment. Movant's security interest purports to attach to property of the debtor existing at the time the security interest was created as well as after-acquired property. Section 552 of the Bankruptcy Code addresses the treatment of after-acquired property clauses in bankruptcy as follows:

(a) Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

---

**1.** Movant has specifically identified only the Coffee County employment contract, but alleges that other such contracts exist.

**2.** 11 U.S.C. § 363.

(b)(1) Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, or profits of such property, then such security interest extends to such proceeds, product, offspring, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

(2) Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, and notwithstanding section 546(b) of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to amounts paid as rents of such property or the fees, charges, accounts, or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties, then such security interest extends to such rents and such fees, charges, accounts, or other payments acquired by the estate after the commencement of the case to the extent provided in such security agreement, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

11 U.S.C. § 552 (West 1994).

■ "Section 552(a) provides the general rule that postpetition property of the debtor or estate is not subject to any lien resulting from any prepetition security agreement.... Section 552(b) provides an exception for liens resulting from any prepetition security agreements which cover 'proceeds,

product, offspring, rents, or profits.'" *Financial Security Assurance, Inc. v. Tollman–Hundley Dalton, L.P.*, 165 B.R. 698, 701 (N.D.Ga.1994). "The language of section 552(b) makes clear that the prepetition security interest only reaches 'proceeds, product, offspring, rents, or profits' to the extent provided by: (1) the security agreement; and (2) the applicable nonbankruptcy law." *Id.* at 702. State law therefore must provide the necessary definitions of "proceeds, product, offspring, rents, or profits." *Id.* at 701 (*citing Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979)). It is Movant's burden to demonstrate that the security agreement in question fits under one of the exceptions to section 552(a) contained in section 552(b). *Id.* at 701. The fact that the parties may have intended a security interest to attach to certain funds is irrelevant if applicable state law and the parties' intent conflict. *Id.* at 704. As the district court in *Tollman* stated, "The parties are not free to disregard state law." *Id.* at 704.

The security agreement before the Court purports to cover after-acquired accounts receivable and proceeds thereof.[3] Therefore, the Court will review the definitions of "accounts receivable" and "proceeds" provided by Georgia law.

The Georgia Code defines an account as follows:

"Account" means any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper, whether or not it has been earned by performance.

O.C.G.A. § 11–9–106 (Michie 1994).

■ The terms "instrument" and "chattel paper" are defined at O.C.G.A. § 11–9–105 as a negotiable instrument and a lease of specific goods respectively. The security agreement before the Court does not appear to be evidenced by instruments or chattel paper. Movant correctly notes that the definition of "account" under the Georgia Code is based upon the 1972 Amendments to the Uniform Commercial Code which merged the previously distinct terms "account" and "con-

---

**3.** Movant has not contended that the funds in question constitute anything other than proceeds of accounts receivable. The Court will limit its analysis accordingly.

tract rights." *See Metter Banking Co. v. Fisher Foods, Inc.*, 183 Ga.App. 441, 443, 359 S.E.2d 145, 146 (1987). The right to payment garnered from performance of the terms of a contract amounts to an account receivable. Hence, Movant's security interest extends to rights to payment from a contract.

It appears initially that Movant's security interest extends to Debtor's right to payment for services which have not yet been performed. However, the definition of "accounts receivable" under state law only defines the nature of the prepetition property. It does not satisfy the requirement under federal law that the object of the purported security interest constitute proceeds of "property of the debtor acquired before the commencement of the case." 11 U.S.C. § 552(b).

The term "proceeds" is defined by the Georgia Code as follows:

(1) "Proceeds" includes whatever is received upon the sale, exchange, collection, or other disposition of collateral or proceeds. Insurance payable by reason of loss or damage to the collateral is proceeds, except to the extent that it is payable to a person other than a party to the security agreement. Money, checks, deposit accounts, and the like are "cash proceeds." All other proceeds are "noncash proceeds."

(2) Except where this article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange, or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor. . . .

(4) In the event of insolvency proceedings instituted by or against a debtor, a secured party with a perfected security interest in proceeds has a perfected security interest *only in the following proceeds:*

(a) In identifiable noncash proceeds, and in separate deposit accounts containing only proceeds;

(b) In identifiable cash proceeds in the form of money which is neither commin-

gled with other money nor deposited in a deposit account prior to the insolvency proceedings;

(c) In identifiable cash proceeds in the form of checks and the like which are not deposited in a deposit account prior to the insolvency proceedings; and

(d) In all cash and deposit accounts of the debtor in which proceeds have been commingled with other funds, but the perfected security interest under this paragraph (d) is:

(i) Subject to any right of setoff; and

(ii) Limited to an amount not greater than the amount of any cash proceeds received by the debtor within ten days before the institution of the insolvency proceedings less the sum of:

(I) The payments to the secured party on account of cash proceeds received by the debtor during such period; and

(II) The cash proceeds received by the debtor during such period to which the secured party is entitled under paragraphs (a) through (c) of this subsection (4).

O.C.G.A. § 11–9–306 (Michie 1994) (emphasis added).

Once the Court determines what constitutes "proceeds" under state law, subsection (4) of O.C.G.A. § 11–9–306 eliminates all security interests in proceeds except those therein described in the event the debtor files for bankruptcy protection. *Unity Natural Foods Of Roswell Inc. v. Collegedale Distributors (In re Unity Foods, Inc.)*, 75 B.R. 222 (Bankr.N.D.Ga.1987). Movant has not alleged which of the allowable types of proceeds listed in subsection (4) applies in this case. However, in the interest of providing a complete discussion, the Court will address the general definitions of proceeds and accounts under Georgia law as it relates to section 552 of the Bankruptcy Code.

■ The Court begins its analysis with the object of Movant's purported security interest: income from a prepetition contract for employment. The definition of "accounts receivable" provided by Georgia law incorporates both earned rights to payment (the

traditional notion of accounts receivable) and money to be generated by performance of a contract. Section 552(b) requires Movant to demonstrate a connection between prepetition and postpetition property. In this case, the connection is that the latter must be proven to be proceeds of the former. The prepetition property from which the postpetition income stems is a contract. Hence, the income must be proceeds of the contract if Movant's security interest is to attach. 11 U.S.C. § 552(b).

It is clear that Movant's security interest covers earned rights to payment, subject to those restrictions contained in O.C.G.A. § 11–9–306(4). When the earned rights to payment are reduced to cash, the cash constitutes proceeds of the accounts receivable as the accounts receivable have been collected and disposed of within the meaning of O.C.G.A. § 11–9–306. However, Movant errs in blurring the distinction between "account receivable" and "proceeds" as to the unearned rights to payment under the contract for employment. The definition of accounts receivable upon which Movant relies defines the money generated from performance of a contract as accounts receivable, not as proceeds. Section 552(b) allows a security interest in postpetition proceeds of property of the debtor acquired prepetition. Accounts receivable are generated by "performance" of a contract. Proceeds are generated by the "sale, exchange, collection, or other disposition" of prepetition collateral. Hence, the prepetition contract for employment only generates "proceeds" when the contract itself is exchanged based on its intrinsic value. This occurs when the contract is sold, exchanged, or otherwise disposed of, and not when it is performed. *See e.g. Driggers v. Continental Grain Co.*, 210 Ga.App. 293, 435 S.E.2d 722 (1993) (proceeds generated from the sale of swine subject to a security interest); *Borg–Warner Acceptance Corp. v. Valentine Assoc. Ltd. Corp.*, 192 Ga.App. 123, 384 S.E.2d 223 (1989) (no proceeds are generated without the sale of collateral); *Metter Banking Co.*, 183 Ga.App. at 443, 359 S.E.2d at 146 (noting that accounts are the right to payment to be earned by sale and proceeds are the funds generated by the sale of collateral). This distinction is best seen by the fact that proceeds are generated by the transformation of a specific piece of collateral through sale or exchange, while accounts receivable are funds generated under a contract whether that contract was for the sale of goods or the provision of services. *Tollman*, 165 B.R. at 708 (revenues from the operation of a hotel are not proceeds under Georgia law; proceeds are created when the hotel property is sold).

The Court notes the difficulty in applying the rationale of cases interpreting the laws of different states. The definition of "proceeds" under Georgia law is limited in the context of bankruptcy proceedings, and Movant has made no effort to liken the definition under Georgia law to the definition applied in those cases which it asserts are persuasive. An analogy to be drawn between cases is only persuasive where the facts and the law applied are at least similar. It is Movant's burden to make such a showing. Movant has failed to carry this burden.

Movant relies upon the case of *United Virginia Bank v. Slab Fork Coal Co. (In re Slab Fork Coal Co.)*, 784 F.2d 1188 (4th Cir.1986) for the proposition that a prepetition lien covers a contract as well as the proceeds generated from the postpetition sale of goods under the contract. Movant misinterprets the holding of the court in *Slab Fork*. Far from supporting Movant's position, the Fourth Circuit Court of Appeals bolsters this Court's distinction between accounts and proceeds within the context of 11 U.S.C. § 552.

In *Slab Fork*, the debtor held a prepetition contract to sell coal to a third party, Armco. At the time the debtor's bankruptcy petition was filed, Armco owed the debtor $900,000.00 for coal delivered prepetition. The debtor shut down its coal production and entered into a agreement with another party, Mabden Coal Company, to complete the debtor's obligations under the contract with Armco. The bankruptcy court had held that the $900,000.00 Armco owed to the debtor for prepetition coal delivery was subject to the bank's security interest, and this finding was not disturbed on appeal. The real issue addressed by the court in *Slab Fork* was

whether the net funds derived from the debtor's "sale" of the contract to Mabden constituted proceeds of the bank's security interest in the Slab Fork/Armco contract. The court held that those funds were proceeds of the prepetition contract. The court did not, as Movant avers, find that the funds generated by sale of coal under the contract were proceeds. Such a finding would have extended the bank's lien to the funds earned by Mabden by performing the contract. Rather, the court found that the funds generated by the debtor in selling the contract to Mabden were proceeds. Thus, the proceeds of the contract were limited to the contract's intrinsic value which was realized when the debtor disposed of the contract. *Marine Bank v. Granda (In re Granda),* 144 B.R. 697 (1992) (under *Slab Fork,* proceeds of a contract are determined by its intrinsic value).

The decision in *In re Sunberg,* 729 F.2d 561 (1984), is also of little help to Movant. In *Sunberg,* the debtor had pledged his crops as well as general intangibles to a prepetition creditor as security for a loan. In a motion to incur secured debt postpetition, the debtor sought to pledge certain government payment in kind (so called PIK) benefits to another creditor. The debtor obtained payment in kind benefits from the federal government by promising not to grow crops on part of his land. The court assumed with little discussion that the payment in kind benefits were proceeds of either the accounts or general intangibles which were pledged to the prepetition creditor as security. The court did not define proceeds, or make an effort to demonstrate how proceeds were created. Since proceeds are defined under state law, and a security interest under section 552(b) depends upon such definition, the *Sunberg* decision is of limited guidance to this Court. This is especially so in light of the limited scope the Georgia Code affords the term "proceeds" within the context of insolvency proceedings. A comparison of the facts without a corresponding comparison of the law applied is of little use. Moreover, the issue the *Sunberg* court discussed was the equity exception in section 552(b)(2), an issue this Court does not address.

The Court notes that the debtors in *Sunberg* had performed their part of the contract by literally doing nothing. The right to payment existed prepetition and did not require any postpetition labor or assets of the estate to bring about the right to payment. Hence, it is easier to see how the prepetition property interest of the creditor could be viewed as transformed in the sense of creating proceeds. If the right to payment had not already been earned, the court would have had to address 11 U.S.C. § 541(a)(6), which prohibits a security interest in services individual debtors perform after the commencement of a case regardless of any proceeds coverage in a contract. The fact that no postpetition services of the debtors were required to bring about the right to payment in kind benefits means that the facts of the *Sunberg* case did not impact upon the debtor's fresh start. The significance of the fresh start is discussed further below.

■ Although this Court is convinced that Debtor's unearned postpetition income under a contract for employment does not constitute proceeds of Movant's prepetition interest in accounts receivable, the fact that this postpetition income is entirely dependent upon Debtor's personal services is significant. This is so because a purported security interest in a debtor's future income or wage equivalent does not give rise to a lien within the meaning of the Bankruptcy Code. *In re Miranda Soto,* 667 F.2d 235 (1st Cir. 1981).

In *Miranda Soto,* the First Circuit Court of Appeals stated:

The question of whether a wage assignment gives rise to a continuing lien is well settled. The accepted rule is that the assignment of future wages as security for a present debt does not constitute a lien within the meaning of the Bankruptcy Code. *Local Loan Co. v. Hunt,* 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230 (1934); *Seaboard Small Loan Corp. v. Ottinger,* 50 F.2d 856 (4th Cir.1931); *In re Morris,* 333 F.Supp. 204 (E.D.Mich.1971); *see also* 1A Collier on Bankruptcy s 17.30 (14th Ed.1978).

An assignment of wages can create a bankruptcy lien only when the wages have

already been earned by the debtor. *In re Dykes,* 326 F.Supp. 998 (D.Kan.1970); *In re West,* 127–28 F.R. 205 (D.Or.1904).

*Miranda Soto,* 667 F.2d at 237.

As indicated by the First Circuit, the well accepted notion that a lien cannot attach to future wages in bankruptcy was first enunciated by the United States Supreme Court in *Local Loan Co. v. Hunt,* 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230 (1934). In that case, the Court stated:

> The earning power of an individual is the power to create property; but it is not translated into property within the meaning of the Bankruptcy Act until it has brought earnings into existence. An adjudication of bankruptcy, followed by a discharge, releases a debtor from all previously incurred debts, with certain exceptions not pertinent here; and it logically cannot be supposed that the act nevertheless intended to keep such debts alive for the purpose of permitting the creation of an enforceable lien upon a subject not existent when the bankruptcy became effective or even arising from, or connected with, preexisting property, but brought into being solely as the fruit of the subsequent labor of the bankrupt. . . .

> When a person assigns future wages, he, in effect, pledges his future earning power. The power of the individual to earn a living for himself and those dependent upon him is in the nature of a personal liberty quite as much if not more than it is a property right. To preserve its free exercise is of the utmost importance, not only because it is a fundamental private necessity, but because it is a matter of great public concern. From the viewpoint of the wage-earner there is little difference between not earning at all and earning wholly for a creditor. Pauperism may be the necessary result of either. The amount of the indebtedness, or the proportion of wages assigned, may here be small, but the principle, once established, will equally apply where both are very great. The new opportunity in life and the clear field for future effort, which is the purpose of the Bankruptcy Act to afford the emancipated debtor, would be of little value to the wage-earner if he were obliged to face the necessity of devoting the whole or a considerable portion of his earnings for an indefinite time in the future to the payment of indebtedness incurred prior to his bankruptcy. Confining our determination to the case at hand, and leaving prospective liens upon other forms of acquisitions to be dealt with as they may arise, we reject the Illinois decisions as to the effect of an assignment of wages earned after bankruptcy as being destructive of the purpose and spirit of the Bankruptcy Act.

*Local Loan,* 292 U.S. at 243–45, 54 S.Ct. at 698–99.

The decision of the Supreme Court in *Local Loan* was driven as much by policy as by its interpretation of property of the estate under the Bankruptcy Act. What about the broad definition of property of the estate contained in section 541, or the fact that section 1306 allows a debtor to fund a repayment plan with future income? The answer is that in creating the present Bankruptcy Code, Congress chose to expand the definition of property of the estate beyond that which was provided by the former Bankruptcy Act. However, Congress preserved the "fresh start" policy so eloquently stated by the Supreme Court in the present Code. Specifically, Congress sought to preserve the "fresh start" by excluding future wages from property of the estate under section 541(a)(6), and requiring that only security interests in after-acquired property "arising from, or connected with, preexisting property . . ." (*Local Loan* 292 U.S. at 243, 54 S.Ct. at 699) be preserved in bankruptcy. The latter was accomplished by enacting 11 U.S.C. § 552 of the Bankruptcy Code, the very section implicated in the matter before this Court. Any analysis of the "fresh start" provisions of the Bankruptcy Code is incomplete without reference to the Supreme Court case which firmly established the fresh start concept in modern American bankruptcy jurisprudence.

The fact that the present case is one under Chapter 13 of the Code is not relevant to analysis of 11 U.S.C. § 552. Section 552 applies to all Chapters under the Code. Moreover, determining that postpetition in-

come of the debtor is property of the estate under section 1306 does not answer the question of whether such income can be the subject of a prepetition security interest. As the court in *In re Flor,* 166 B.R. 512 (Bankr. D.Conn.1994) stated:

Congress specifically tailored Chapter 13 to provide flexible relief to wage-earner debtors who voluntarily sought a means of repaying their debts without incurring the stigma and other consequences of straight-liquidation bankruptcy. *See In re Lennon,* 65 B.R. 130, 131–32 (Bankr.N.D.Ga.1986). Chapter 13 allows a debtor to fund a plan out of the debtor's earnings, *see* § 1306(a)(2), [footnote omitted], but only after paying careful attention to the doctrine of *Local Loan* and the prohibition of involuntary servitude contained in the Thirteenth Amendment. *See In re Cooley,* 87 B.R. 432, 440 (Bankr.S.D.Tex.1988).

*Id.* at 514–15.

Every court addressing this issue in a case under Chapter 13 has held that a purported security interest on a debtor's income or income equivalent is not a lien within the meaning of the Bankruptcy Code. *United States v. Jones (In re Jones),* 181 B.R. 538 (D.Kan.1995) (postpetition payments under noncompetition clause of prepetition contract for sale of business not income but rather proceeds of prepetition goodwill allowing lien to attach); *In re Scott,* 142 B.R. 126 (Bankr. E.D.Va.1992) (*citing Miranda Soto* and stating alternatively that section 552(a) terminates a lien on future wages); *Feliciano v. Sistema de Retiro del E.L.A. (In re Feliciano),* 111 B.R. 380 (Bankr.D.Puerto Rico 1990) (wage assignment giving rise to a continuing lien on wages is not a lien under the Bankruptcy Code); *Ortiz Vega v. Asociacion Empleados Del Estado Libre Asociado De Puerto Rico (In re Ortiz Vega),* 75 B.R. 858 (Bankr.D.Puerto Rico 1987) (same). Of particular interest to the matter before this Court is the case of *Trust Co. Bank v. Walker (In re Walker),* 35 B.R. 237 (Bankr. N.D.Ga.1983). The debtor in *Walker* had assigned his accounts receivable as well as his contract rights to a creditor as security prior to filing his Chapter 13 petition. Like

this Court, the court in *Walker* found that the assignment of future accounts and contract rights created a valid security interest under state law. *Id.* at 239. Nevertheless, the court held that a debtor's assignment of future commissions under a prepetition insurance contract is analogous to an assignment of future wages, and may not survive the application of section 552(a). *Id.* at 242. The *Walker* case was later cited with approval by the Eleventh Circuit Court of Appeals in the case of *First National Bank of Atlanta v. Willis (In re Jones),* 908 F.2d 859, 861 (11th Cir.1990) as a correct statement of the law. The relevant facts between the *Walker* case and the case before this Court are indistinguishable, and so is the result.

Movant's Motion for Reconsideration of this Court's prior order will be denied. An order in accordance with this memorandum opinion will be entered on this date.

### ORDER

A Motion for Reconsideration was filed by Coffee County Bank. For the reasons stated in the accompanying memorandum opinion published pursuant to Fed.R.Bankr.P. 7052, it is hereby

ORDERED that the Motion for Reconsideration is DENIED; and it is hereby further

ORDERED that Coffee County Bank's security interest in the Debtor's accounts receivable be limited to those accounts earned by performance prepetition, and proceeds thereof as defined by the accompanying memorandum opinion; and it is hereby further

ORDERED that Coffee County Bank submit to the Court an amended proof of claim within twenty (20) days conforming to the above styled memorandum opinion.

SO ORDERED.