In re James Paul **PULASKI** and Judith Pearl Pulaski, Debtors.

James Paul Pulaski and Judith Pearl Pulaski, Plaintiffs,

v.

Dakota Financial, LLC, Defendant.

Bankruptcy No. 11–14135–13.
Adversary No. 11–282.

United States Bankruptcy Court, W.D. Wisconsin.

July 13, 2012.

---

**3.** Mohns does not argue that the trustee was wrong to think that he could not have held an estate sale in the Wilsons' home.

Melvyn L. Hoffman, Esq., Hoffman Law Firm, L.L.C., La Crosse, WI, for Plaintiff.

Brian P. Thill, Esq., Murphy Desmond S.C., Madison, WI, for Defendant.

## *ORDER*

THOMAS S. UTSCHIG, Bankruptcy Judge.

The Pulaskis filed this adversary proceeding in hopes of avoiding the defendant's mortgage on their homestead. The claims asserted in their adversary complaint primarily arise under Wisconsin law rather than the bankruptcy code, and include attacks on the validity of the mortgage due to unconscionability, lack of consideration, mistake, misrepresentation, unjust enrichment, breach of contract, and breach of the duty of good faith and fair dealing. In response, in the joint pretrial statement and at the initial pretrial conference, the defendant raised the

argument that under the U.S. Supreme Court's decision in *Stern v. Marshall,* — U.S. ——, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011), this Court lacks the constitutional authority to rule on the Pulaskis' state law claims. The matter was fully briefed. This is a core proceeding under 28 U.S.C. § 157(b)(2)(B) and (K), and the Court has jurisdiction under 28 U.S.C. § 1334.

James Pulaski became an independent over-the-road truck driver after losing his previous employment in the spring of 2009. He purchased a semi-tractor and trailer from the defendant. The purchase was financed through an equipment lease. After executing the lease, the defendant presented the Pulaskis with a mortgage on their home, which they also signed. They voluntarily surrendered the tractor and trailer to the defendant in April of 2011. This chapter 13 case was filed the following June. The defendant filed a proof of claim in which it asserted a secured claim in the amount of $57,684.98, ostensibly representing the balance due on the equipment lease and secured by the mortgage on their home. The Pulaskis objected to the claim and filed this adversary proceeding to avoid the mortgage. Both the objection and the adversary proceeding are intended to achieve a single purpose: namely, to have the bank's claim treated as an unsecured claim rather than a secured one.[1]

At this point, anyone with even a passing familiarity with recent developments in bankruptcy law has probably memorized the salient facts of *Stern v. Marshall,* Suffice it to say that Vickie Lynn Marshall (otherwise known as former Playboy Play-mate Anna Nicole Smith) filed bankruptcy in California during a heated dispute over the estate of her deceased husband, J. Howard Marshall. Marshall's son Pierce filed a defamation claim in the bankruptcy proceeding and also filed a complaint to determine dischargeability. Vicki filed a counterclaim alleging that Pierce had tortiously interfered with her expectation of an inheritance. Rather than abstain in favor of the pending Texas probate proceeding (where both the defamation and tortious interference claims had been initially raised), the bankruptcy court proceeded to rule in Vickie's favor on both issues. In a subsequent series of developments truly worthy of the many comparisons to the byzantine legal proceedings at the heart of Charles Dickens' *Bleak House,* both litigants died during the ensuing decade while the case went to the Supreme Court not once, but twice.

On the second trip, the Supreme Court ruled that while the bankruptcy court had the statutory authority to consider Vickie's counterclaim under 28 U.S.C. § 157(b)(2)(C) (which considers "counterclaims by the estate against persons filing claims against the estate" to be "core proceedings" which may be adjudicated to final judgment by bankruptcy judges), the court lacked the *constitutional* authority to do so under Article III of the U.S. Constitution. As the Court observed:

> When a suit is made of "the stuff of the traditional actions at common law tried by the courts at Westminister in 1789," and is brought within the bounds of federal jurisdiction, the responsibility for deciding that suit rests with Article III judges in Article III courts.

---

1. This Court has always adhered to the notion that a debtor seeking to avoid a mortgage for whatever reason (for example, to "strip off" an unsecured junior mortgage or the like) must file an adversary proceeding under Fed. R. Bankr.P. 7001(2) (to determine the validity, priority, or extent of a lien) in order to do so. Essentially, the adversary process is the vehicle for resolution of the objection to the claim in such cases.

131 S.Ct. at 2609 (quoting *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 90, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (Rehnquist, J., concurring in judgment)). The Court characterized Vickie's counterclaim as arising "under state common law between two private parties" and observed that adjudication of such a claim implicated "the most prototypical exercise of judicial power: the entry of a final, binding judgment *by a court* with broad substantive jurisdiction ... when the action neither derives from nor depends upon any agency regulatory regime." *Id.* at 2614–15.

In the wake of *Stern*, and despite the Court's assurance that the issue before it was a "narrow" one,[2] the nation's bankruptcy courts were left to ponder whether the foundations of the system were merely shaken or completely upended. *See e.g., Gecker v. Flynn (In re Emerald Casino),* 467 B.R. 128, 131 (N.D.Ill.2012) ("In the months since the Supreme Court's ruling in *Stern*, dozens of courts have considered its impact on pending bankruptcy proceedings."); *Tabor v. Kelly (In re Davis),* No. 07–05181, 2011 WL 5429095, at *15 (Bankr.W.D.Tenn. Oct. 5, 2011) ("The impact of *Stern* is that neither the bankruptcy court nor the parties may simply rely upon the list of core proceedings provided by Congress to determine whether a bankruptcy judge may *finally* determine a particular proceeding. Instead, the bankruptcy court must determine whether the proceeding is a matter of public or private right."); *In re Black, Davis & Shue Agency, Inc. v. Frontier Ins. Co. (In re Black, Davis & Shue Agency, Inc.),* 471 B.R. 381, 401 (Bankr.M.D.Pa.2012) (noting the two

lines of reasoning regarding *Stern:* the "minimal impact" approach and the competing perspective that the decision "significantly limits a bankruptcy court's constitutional authority to adjudicate claims that arise outside the Bankruptcy Code").

In *Ortiz v. Aurora Health Care, Inc.,* 665 F.3d 906 (7th Cir.2011), the Seventh Circuit had its first (but likely not its last) opportunity to address the impact of *Stern* on the multiplicity of issues which have, for many years, routinely been handled by bankruptcy courts. In *Ortiz,* a creditor filed numerous claims in various bankruptcy cases and included information which allegedly violated a Wisconsin statute governing the confidentiality of health care records. The debtors filed a class action lawsuit against the creditor in the bankruptcy court. The bankruptcy judge granted summary judgment to the creditor based upon an interpretation of state law (essentially finding that the debtors had failed to identify any actual damage suffered as a result of the alleged violation). On appeal, the Seventh Circuit concluded that as the bankruptcy judge lacked the authority under Article III of the Constitution to enter a final judgment on the debtors' claims, the grant of summary judgment was improper. *Id.* at 909. The appeal was dismissed and remanded.

In doing so, the Seventh Circuit synthesized the holding in *Stern* this way: "The Court held that Article III prohibited Congress from giving bankruptcy courts authority to adjudicate claims that went beyond the claims allowance process." *Id.* at 911.[3] The alleged violations at issue in

---

2. *See* 131 S.Ct. at 2620. The Court also stated that "[w]e do not think the removal of counterclaims such as Vickie's from core bankruptcy jurisdiction meaningfully changes the division of labor in the current statute." *Id.*

3. This appears to be a reference to the Supreme Court's admonition that:
   Congress may not bypass Article III simply because a proceeding may have *some* bearing on a bankruptcy case; the question is whether the action at issue stems from the

*Ortiz* were, according to the circuit court, a private matter involving liability under Wisconsin law and did not flow from a federal statutory scheme. *Id.* at 914. The claims were "ordinary state-law claims" and would not be resolved in the claims allowance process but rather were an attempt to "augment" the bankruptcy estate; as such, the bankruptcy court lacked the authority to enter a final judgment. *Id.* In this case, the defendant contends that the complaint raises claims which fall within the same basic construct: namely, state law claims among private parties which seek to "augment" the bankruptcy estate by removal of the mortgage lien and recovering various (albeit unspecified and, according to the Pulaskis, unsought) damages.

Were there a pending state court action between the parties, this Court's historical practice in a case such as this would have been to entertain (or invite) a motion for abstention under 28 U.S.C. § 1334(b).[4] The final result would have been given preclusive effect in these proceedings and the issue of constitutional authority (as wonderfully intellectually compelling as such matters are) would have been sub-

sumed into the practical realities of reorganization. Now perhaps one can quibble about whether a court may "abstain" from hearing a matter that it may lack the constitutional authority to decide, but regardless of the label the outcome would have been a decision by a court with unquestioned power to resolve the merits.[5] However, there is no pending state court matter. The defendant does not deny that this Court has the statutory authority (or jurisdiction) to hear these claims. Since the notions of comity and deference only go so far, this Court cannot simply tell the Pulaskis to go file a state court lawsuit when they have already raised the issues here and the matter has not been joined elsewhere. As such, the Pulaskis are entitled to have the matter heard in this forum unless this Court lacks the *constitutional* authority to enter a final judgment on their claims.

■ In responding to this question, many decisions have tracked the evolution of bankruptcy jurisdiction, the constitutional authority of Article I courts, and the nature of "public rights" as opposed to

bankruptcy itself *or* would necessarily be resolved in the claims allowance process. 131 S. Ct. at 2618 (emphasis added).

4. As a practical matter, abstention—out of respect for and in comity with the Texas probate court—likely would have prevented much of the *Stern* miasma, because there would have been no debate over which court had issued the "first" final order. *See* 28 U.S.C. § 1334(c)(1) (setting forth the standard for abstention "in the interest of justice, or in the interest of comity with State courts or respect for State law").

5. There are certainly commentators who question the logic of both *Stern* and its predecessor in carving away at the authority of bankruptcy courts, the 1982 *Northern Pipeline* decision. *See* Eric G. Behrens, *Stern v. Marshall: The Supreme Court's Continuing Ero-*

*sion of Bankruptcy Court Jurisdiction and Article I Courts*, 85 Am. Bankr. L.J. 387, 405 (2011) ("Legal scholars have eviscerated the plurality decision [in *Northern Pipeline*], in particular the plurality's arbitrary exceptions and shallow attempts to distinguish the Court's prior Article I and III decisions."). And the irony of the significant weight given to the accoutrements of Article III status (such as the lifetime appointment or the salary that cannot be adjusted downward by Congress) to deny a range of judicial authority to Article I bankruptcy judges is that state court judges routinely lack such protections but are fully capable of entering final judgments— even on matters that might involve federal bankruptcy law. *See Eden v. Robert A. Chapski, Ltd.*, 405 F.3d 582, 586 (7th Cir.2005) (noting the concurrent jurisdiction of state courts to resolve questions of dischargeability of certain claims).

mere "private" ones.[6] The scholarship of these post-*Stern* cases is impressive both for its comprehensive nature and its thoughtful consideration of the appropriate role of the bankruptcy courts. This Court will not embark upon a similar study for fear of being, as the saying goes, "redundant and repetitive." Rather than attempt to articulate a bright line between what may be reduced to final judgment and what cannot, the Court will simply consider whether, in light of *Stern* and *Ortiz*, the issues in this case sufficiently implicate the process of adjudicating claims against the Pulaskis or their bankruptcy estate.

While the defendant suggests that the debtors hope to "augment" their bankruptcy estate by raising the state law claims at issue, this is not a situation in which a debtor brings an unrelated (but nonetheless "compulsory") counterclaim against a creditor, essentially seeking an offset against the creditor's claim. In this case, the creditor's proof of claim asserts that its claim is secured by certain assets (namely, the Pulaskis' home). The debtors deny this. Under 11 U.S.C. § 502(a), a proof of claim is "deemed allowed, unless a party in interest ... objects." If an objection is made, the Court is required to determine the amount of the claim and allow it in that amount except to the extent that "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law." *See* 11 U.S.C. § 502(b)(1).

As the debtors note in their brief, they have not asked for monetary relief. They have asked only that the creditor's mortgage be found invalid for the reasons raised in their objection to the claim and their adversary complaint. Those reasons—which are based upon the "applicable law" of the forum state in which the real property is situated—happen to be state law claims, but they are also an attack on the very nature of the creditor's claim. Put another way, the Pulaskis contend that under applicable state law, the creditor has only an *unsecured* claim, and they want the claim allowed only to that extent. Resolving their objection requires consideration of the validity of the mortgage, and the issues raised by the Pulaskis are all reasons why they feel the mortgage is *invalid*. Clearly this is part of the claims process, as the Pulaskis' claims will be resolved at exactly the same time that there is a final determination as to whether the creditor is secured or not.[7]

■ One of the challenges in a post-*Stern* world is the reality that state law is often inexorably intertwined with bankruptcy law. After all, property rights in bankruptcy are typically determined by reference to *state law*, a principle the Supreme Court has never suggested holds any level of constitutional infirmity. In fact, the Court specifically *reaffirmed* that notion in *Stern*, observing that property interests "are created and defined by state

**6.** *See, e.g., Turner v. First Cmty. Credit Union (In re Turner)*, 462 B.R. 214 (Bankr.S.D.Tex. 2011); *In re Salander O'Reilly Galleries*, 453 B.R. 106 (Bankr.S.D.N.Y.2011); *Adams Nat'l Bank v. GB Herndon & Assocs. (In re GB Herndon and Assocs.)*, 459 B.R. 148 (Bankr. D.D.C.2011); *McClelland v. Grubb & Ellis Valuation & Advisory Group (In re McClelland)*, 460 B.R. 397 (Bankr.S.D.N.Y.2011); *Meoli v. Huntington Nat'l Bank (In re Teleservices Group. Inc.)*, 456 B.R. 318 (Bankr. W.D.Mich.2011); *Paloian v. Am. Express Co.*

*(In re Canopy Fin., Inc.)*, 464 B.R. 770 (N.D.Ill.2011).

**7.** As the debtors have objected to the creditor's claim, it has not been allowed. *See* 11 U.S.C. § 502(a). When will the creditor's claim be "allowed" as a secured claim under § 502(b)(1)? Only once there is a determination that the creditor is *not* guilty of unjust enrichment, mistake, unconscionability, or the like—and not a moment before.

law," and that unless "some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." 131 S.Ct. at 2616 (quoting *Travelers Cas. & Sur. Co. of Am. v. PG & E,* 549 U.S. 443, 451, 127 S.Ct. 1199, 167 L.Ed.2d 178 (2007)). Essentially, *Stern* teaches that there are certain claims which are beyond the authority of an Article I bankruptcy judge to decide, if only because they have such a small "bearing" on (or perhaps, connection to) the bankruptcy case. But the Supreme Court also instructed that the question to ask is whether "the action at issue *stems from the bankruptcy itself* or would *necessarily be resolved in the claims allowance process.*" 131 S.Ct. at 2618 (emphasis added). If so, the bankruptcy court may render a final judgment on the matter.

The problem with the creditor's argument is illustrated by the following hypothetical. Presume for a moment that a creditor files a proof of claim in which it claims to hold a mortgage. Let us further say that the bankruptcy trustee discovers that no mortgage was ever executed. Under state law, the creditor would not, in fact, hold a secured claim at all. Should the trustee object to the claim, it would be because the claim is unenforceable "against property of the debtor" under "applicable law." The essence of the claims allowance process is the determination of the claim's validity—i.e., its conformity to the requirements of applicable law. Whether a secured claim is defective because it fails to satisfy the state's statute of frauds, the recording statute, or rules regarding unconscionability, fair dealing, or mistake, it is all the same on a fundamental level. The claim itself is being attacked, not offset. Any augmentation of the estate arises not by addition (i.e., through a separate state law claim that increases the estate irrespective of the resolution of the creditor's claim) but rather through negation—or modification—of the *creditor's claim itself.* Accepting the creditor's argument would essentially be to conclude that bankruptcy courts may no longer enter final judgments as to the allowance of claims, and nothing in *Stern* justifies such a radical interpretation.

■■■ The allowance (or disallowance) of claims is a subject within the exclusive purview of the bankruptcy courts. *Black, Davis and Shue,* 471 B.R. 381, 2012 WL 360062, at *10 (quoting *Canal Corp. v. Finnman (In re Johnson),* 960 F.2d 396, 404 (4th Cir.1992)). When a party files a proof of claim with the bankruptcy court, it consents to the court's jurisdiction to make a final decision as to the claim. *See Langenkamp v. Culp,* 498 U.S. 42, 44, 111 S.Ct. 330, 112 L.Ed.2d 343 (1990). Or as the Supreme Court has otherwise observed, "[H]e who invokes the aid of the bankruptcy court by offering a proof of claim and demanding its allowance must abide by the consequences of that procedure." *Stern,* 131 S.Ct. at 2616 (quoting *Katchen v. Landy,* 382 U.S. 323, 333 n. 9, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966)). In the present case, the defendant filed a proof of claim in which it alleges that its claim is secured by an interest in the debtors' homestead pursuant to Wisconsin law. The question of the secured nature of that claim is now "part of the claims allowance process" and subject to resolution by the bankruptcy court. *See Stern,* 131 S.Ct. at 2617.

In contrast, the counterclaim in *Stern* was a state tort action that existed "without regard to any bankruptcy proceeding" and was "in no way derived from or dependent upon bankruptcy law." 131 S.Ct. at 2618. The claims at issue in *Ortiz* were also independent of the process of adjudi-

cating claims against the estate. As the Seventh Circuit noted, "Nothing about these decisions [i.e., the bankruptcy court's interpretation of state law] involved an adjudication of Aurora's proofs of claim," and there was no reason to believe that the process of adjudicating the debtors' claims would necessarily resolve the *creditor's* claim. 665 F.3d at 914.[8] While the Pulaskis' claims could have been brought in state court (either in response to a foreclosure action or as an attempt to invalidate the mortgage), this is a chapter 13 bankruptcy proceeding in which the debtors hope to reorganize their financial affairs, including the claims against their home. If the defendant's claim is allowed, the debtors' plan is no longer feasible. They will have to modify the plan, dismiss the case, or otherwise resolve the defendant's claim.

Until their objection (and this adversary proceeding) are resolved, the defendant's claim essentially sits in limbo. The question is whether under "applicable law" the defendant's mortgage is unenforceable against "property of the debtor" for the reasons asserted in the complaint. *See* 11 U.S.C. § 502(b)(1). Because the defendant seeks to have the claim treated as a secured claim and paid through the debtors' plan, the issues raised by the debtors are now "integral to the restructuring of the debtor-creditor relationship." *Ortiz,* 665 F.3d at 914 (citation omitted). After all, a decision in the debtors' favor will have the effect of reclassifying the claim as unsecured rather than secured, which would preclude dismissal or the need to modify their plan. There is arguably no determination more integral to the bankruptcy system than one which ascertains the status of claims asserted against the debtor or estate property. On a fundamental level, the claims raised in *Stern* and *Ortiz* simply did not sufficiently implicate the process of adjudicating claims *against the estate,* as the claims at issue could be severed from consideration of the creditors' claims for purposes of decision.

■ In examining this issue recently, one court observed that if the debtor's claim can be resolved without considering the creditor's claim, then the bankruptcy court lacks the constitutional authority to hear the debtor's claim. *Black, Davis and Shue,* 471 B.R. at 402.[9] The corollary is that when the debtor's claim and the validity of the creditor's claim are sufficiently tied together, the bankruptcy court is authorized under *Stern* to enter a final judgment. *Id.; see also Oxford Expositions, LLC v. Questex Media Group LLC (In re*

---

**8.** *Put another way:* In *Ortiz,* the creditor filed proofs of claim on open medical accounts. The complaint filed by the debtors had nothing to do with the claims themselves (for example, an allegation that the creditor had miscalculated the balance due or even engaged in more egregious conduct such as bad faith, misrepresentation, or the like). Instead, the debtors wanted a determination that what the creditor had done in the bankruptcy court violated the state disclosure law. Resolution of that issue does not implicate the claims adjudication process, which would contemplate the determination as to whether the creditor's claims were "unenforceable against the debtor and property of the debtor." *See* 11 U.S.C. § 502(b)(1).

**9.** The court in that case also concluded that the debtor's counterclaims for breach of contract, negligence, breach of fiduciary duty, unjust enrichment, promissory estoppel, and breach of the covenant of good faith and fair dealing would all be necessarily resolved in the process of deciding the validity of the creditor's claims. *See* 471 B.R. at 404–06. This conclusion was premised upon the same rationale adopted by this Court: the idea that resolution of the creditor's claim was contingent upon resolution of the claims raised by the debtor. *Id.* at 404 ("I perceive no theory of recovery asserted by Debtor ... that will not necessarily be resolved in the process of deciding the validity of [the creditor's] claims").

*Oxford Expositions, LLC)*, 466 B.R. 818 (Bankr.N.D.Miss.2011); *In re Olde Prairie Block Owner, LLC*, 457 B.R. 692, 698–99 (Bankr.N.D.Ill.2011). Given that the Pulaskis' claims relate to the creditor's conduct in taking the mortgage which is the subject of its proof of claim, their claims cannot be considered, let alone resolved, without passing on the validity of the mortgage (and the secured nature of the claim). As such, the creditor's claim will necessarily be resolved at the same time as the debtors' claims and the Court has the constitutional authority to enter final judgment.

■ The Court is quite mindful of the fact that Congress may "no more lawfully chip away at the authority of the Judicial Branch than it may eliminate it entirely." *Stern*, 131 S.Ct. at 2620; *Ortiz*, 665 F.3d at 911. But the Supreme Court did not say that the entire bankruptcy system established by Congress was defective. It simply found that Congress gave too much authority to an Article I court in one specific respect. *Stern* makes no effort to alter the bankruptcy court's authority to consider state law issues whenever they stem from the bankruptcy itself or would necessarily be resolved in the claims allowance process. The Pulaskis have raised these claims because they will facilitate their reorganization and because they will determine whether the creditor's claim is secured by their homestead. Unlike the claims in *Stern* or *Ortiz*, these claims will necessarily be resolved in the claims adjudication process and this Court may enter a final judgment upon them.[10]

Accordingly,

10. Of course, in an abundance of caution, any judgment the Court renders may be framed in the alternative so as to allow the district court to accept the findings and conclusions as proposed, rather than final, in the event the district court disagrees with this Court's conclu-

IT IS ORDERED that this case shall proceed to trial. An adjourned pretrial conference has been scheduled for September 20, 2012, at 11:00 a.m.

sions as to the extent of its constitutional authority. *See Ortiz v. Aurora Health Care, Inc. (In re Ortiz)*, 464 B.R. 807, 811 (Bankr. E.D.Wis.2012) (bankruptcy court may enter proposed findings and conclusions when necessary in a core proceeding).