IN RE: John Joseph Louis JOHNSON, III, Debtor.

John Joseph Louis Johnson, III, Plaintiff,

v.

RFF Family Partnership, LP, Defendant.

Case No. 14-57104
Adv. Pro. No. 16-2088

United States Bankruptcy Court,
S.D. Ohio, Eastern Division,
at Columbus.

Signed August 16, 2016

Daniel A. DeMarco, Cleveland, OH, Marc J. Kessler, Hahn Loeser & Parks LLP, Columbus, OH, for Plaintiff.

Jeffrey Mark Levinson, Cleveland, OH, for Defendant.

## OPINION AND ORDER ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (ADV. DOC. 4)

John E. Hoffman, Jr., United States Bankruptcy Judge

### I. Introduction

This matter is before the Court on the motion for summary judgment (the "Motion") (Adv. Doc. 4) filed by John Joseph Louis Johnson, III (the "Debtor"). By the Motion, the Debtor seeks a judgment as a matter of law against RFF Family Partnership, LP ("RFF") on his complaint for declaratory relief. Specifically, the Debtor seeks a declaration that: (1) RFF does not have a valid security interest in, or assignment of, the Debtor's player contract or the salary payments under the contract; and (2) even if it did, RFF's interest with respect to the salary the Debtor earned postpetition was cut off by § 552 of the Bankruptcy Code when he filed his bankruptcy petition. For the reasons stated below, the Court grants the Motion.

### II. Jurisdiction and Constitutional Authority

The Court has jurisdiction to hear and determine this adversary proceeding under 28 U.S.C. §§ 157 and 1334 and the general order of reference entered in this district. This is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(K). The Court also has the constitutional authority to enter a final judgment as to the validity of RFF's security interest under California law. *See, e.g., GMAC Mortg. v. Orcutt*, 506 B.R. 52, 62 (D.Vt.2014) ("[Bankruptcy judges] may hear cases ... when the claim becomes 'integral to the restructuring of the debtor-creditor relationship,' as was the case here given GMAC's insistence upon secured creditor status under the Plan." (internal quotation marks omitted) (quoting *Ortiz v. Aurora Health Care, Inc. (In re Ortiz)*, 665 F.3d 906, 914 (7th Cir.2011))); *Pulaski v. Dakota Fin., LLC (In re Pulaski)*, 475 B.R. 681, 688 (Bankr.W.D.Wis.2012) ("There is arguably no determination more integral to the bankruptcy system than one which ascertains the status of claims asserted against the debtor or estate property."). The Court's constitutional authority to enter a final judgment also extends to its declaration as to the effect of § 552 of the Bankruptcy Code. *See In re Benanti*, No. 15–71018, 2015 WL 6460010, at *2 (Bankr.C.D.Ill. Oct. 26, 2015) (holding that issue of whether creditor had a perfected security interest in postpetition rents pursuant to § 552(b)(2) "stem[s] from the bankruptcy itself and arise[s] specifically under the provisions of the [Bankruptcy] Code and therefore may be constitutionally decided by a bankruptcy judge"); *cf. Rhiel v. Cent. Mortg. Co. (In re Kebe)*, No. 10–2172, 2014 WL 8276561, at *1 (Bankr. S.D.Ohio Dec. 23, 2014) (holding that issue of whether Chapter 7 trustee could sell property of the estate free of the interests of the property's co-owner pursuant to § 363(h) "arises under the Bankruptcy

Code and 'stems from the bankruptcy itself [.]' " (quoting *Stern v. Marshall*, 564 U.S. 462, 499, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011))).

## III. Background

The Court has detailed in two prior opinions some of the events that led to the Debtor's bankruptcy filing and his relationship with RFF. *See In re Johnson*, 546 B.R. 83 (Bankr.S.D.Ohio 2016) ("*Johnson I* "); *In re Johnson*, 548 B.R. 770 (Bankr. S.D.Ohio 2016) ("*Johnson II* "). In short, the Debtor plays hockey for the Columbus Blue Jackets[1] of the National Hockey League under a contract providing him with $30.5 million over seven years from January 2011 (the "Player Contract") (Adv. Doc. 9).[2] *Johnson I*, 546 B.R. at 100. The Debtor took out several large loans with RFF in the fall of 2013, and in January 2014, he issued a final promissory note (the "Note") (Ex. E) to RFF for the sum of $1,862,500. *See Johnson II*, 548 B.R. at 776. In conjunction with the Note, the Debtor executed three other documents that are relevant to this adversary proceeding: (1) a security and pledge agreement (the "Security Agreement") (Ex. F); (2) an assignment of contracts (the "Assignment") (Ex. H); and (3) a notarized

letter directing the Blue Jackets to direct payments under the Player Contract to RFF (the "Letter Agreement")[3] (Ex. I) (collectively with the Note, the Security Agreement and the Assignment, the "Loan Documents").[4]

Under the Security Agreement, the Debtor "pledges and grants to [RFF] a first priority security interest in and lien upon" substantially all of the Debtor's property then existing or to be acquired, including "the payment, proceeds, and rights under and related to the [Player Contract]." Sec. Agreement ¶ 2(a). Under the Assignment, the Debtor "[a]ssign[s], transfer[s] and set[s] over to [RFF] all of [his] right, title and interest in and to the payment, proceeds, and rights under and related to the [Player Contract] and such sums due thereunder as and when payable to [the Debtor]." Assignment ¶ 1(a). The Assignment includes representations by the Debtor that: (1) "No person or entity is required to consent to the assignment herein;" and (2) "[The Debtor] has not made any prior assignment of any right, title or interest in the [Player Contract] to any person or entity." Assignment ¶ 3(d), (e).[5] Finally, the Letter Agreement directs

---

**1.** The Debtor initially played for the Los Angeles Kings, but his contract was assigned to the Blue Jackets in 2012. *Johnson I*, 546 B.R. at 100 n. 15.

**2.** Exhibit B to the Motion is an incomplete copy of the Player Contract. The Debtor filed the full and complete copy of the Player Contract along with an authenticating affidavit on August 2, 2016. Adv. Doc. 9.

**3.** RFF has argued that the defined term for this document is "misleading." *See* Adv. Doc. 7 (the "Response") at 13. The Court selected the phrase "Letter Agreement," because the document describes itself as such. Ex. I at 2 ("This letter agreement is executed and delivered . . . .").

**4.** In a separate adversary proceeding brought by RFF against the Debtor, Adv. No. 15–2117,

the parties dispute the enforceability of the Loan Documents and each alleges that the other engaged in fraud. The Court here does not need to determine these issues. It has been presented with the underlying documents and must merely decide whether by virtue of those documents—assuming they are otherwise enforceable—RFF has a security interest in the salary payments under the Player Contract or the Player Contract itself. Therefore, nothing in this opinion should be construed as a finding bearing on the issues presented in Adv. No. 15–2117.

**5.** The Assignment also purports to assign the Debtor's interest in a joint venture project agreement, which is not at issue here and which was collectively defined with the Player Contract as the "Contracts." Because this adversary proceeding concerns only RFF's inter-

the Blue Jackets to make "all payments due and owing" under the Player Contract to RFF and purports to be irrevocable by the Debtor. Letter Agreement at 2–3. RFF sought to perfect its alleged security interest by filing Uniform Commercial Code financing statements in multiple jurisdictions (Ex. G).

The Debtor filed his voluntary petition for relief under Chapter 11 of the Bankruptcy Code on October 7, 2014 (the "Petition Date"). Since then, RFF has repeatedly asserted that the Note is secured by the Player Contract. *See Johnson II*, 548 B.R. at 779–80. In an effort to finally resolve the issue of RFF's secured status, the Debtor filed an adversary complaint (the "Complaint") (Adv. Doc. 1) against RFF on May 11, 2016. The Complaint seeks a declaratory judgment that RFF does not hold a valid assignment of the Player Contract or the Debtor's wages and that, in any event, § 552(a) of the Bankruptcy Code "cuts off any alleged security interest claimed by RFF with respect to the Player[ ] Contract, or any wages, earnings, and/or proceeds thereof." Compl. at 8. The Debtor filed the Motion, and RFF thereafter filed its answer to the Complaint (the "Answer") (Adv. Doc. 6) and the Response to the Motion, to which the Debtor filed his reply (the "Reply") (Adv. Doc. 8).

### IV. Legal Analysis

#### A. Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, made applicable in this adversary proceeding by Rule 7056 of the Federal Rules of Bankruptcy Procedure, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party

moving for summary judgment "always bears the initial responsibility of informing the ... court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "If the movant satisfies this burden, the non-moving party must then assert that a fact is genuinely disputed and must support the assertion by citing to particular parts of the record." *Stubbins v. BAC Home Loans Servicing, LP (In re Sunnafrank)*, 456 B.R. 885, 888 (Bankr.S.D.Ohio 2011). A dispute is genuine only if it is "based on evidence upon which a reasonable [finder of fact] could return a [judgment] in favor of the non-moving party." *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 270 (6th Cir.2009); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). And "[a] factual dispute concerns a 'material' fact only if its resolution might affect the outcome of the suit under the governing substantive law." *Gallagher*, 567 F.3d at 270.

#### B. California Labor Code Section 300

"Assignments of personal earnings are not favored." *In re Pierson*, 447 B.R. 840, 846 (Bankr.N.D.Ohio 2011) (citing *Dorfman v. Moorhous (In re Moorhous)*, 108 F.3d 51, 55–56 (4th Cir.1997)). "Based on this [public policy], the permissibility of wage assignments and assignments of other personal earnings is normally governed by statute, with many statutes either prohibiting or constraining a person's ability to assign their wages." *Id.*; *see also* 49 Fed. Reg. 7740, 7756 (Mar. 1, 1984) (listing state statutes prohibiting or restricting wage assignments).

---

est in the Player Contract, any reference in the Assignment to the "Contracts" will be

changed so that the term will refer only to the Player Contract.

The Note, the Security Agreement, the Assignment and the Player Contract are all governed by California law. California law therefore applies.[6]

Section 300 of the California Labor Code ("Section 300") prohibits wage assignments unless certain "rigorous requirements" are met. *Fitch v. Pac. Fid. Life Ins. Co.*, 54 Cal.App.3d 140, 126 Cal.Rptr. 445, 448 (1975). In particular, Section 300(b) sets out a list of seven conditions that all must be satisfied for a purported assignment of wages or salary to be valid:[7]

(1) The assignment is contained in a separate written instrument, signed by the person by whom the wages or salary have been earned or are to be earned, and identifying specifically the transaction to which the assignment relates.

(2) Where the assignment is made by a married person, the written consent of the spouse of the person making the assignment is attached to the assignment. . . .

(3) Where the assignment is made by a minor, the written consent of a parent or guardian of the minor is attached to the assignment.

(4) Where the assignment is made by a person who is unmarried or who is an adult or who is both unmarried and an adult, a written statement by the person making the assignment, setting forth such facts, is attached to or included in the assignment.

(5) No other assignment exists in connection with the same transaction or series of transactions and a written statement by the person making the assignment to that effect is attached to or included in the assignment.

(6) A copy of the assignment and of the written statement provided for in paragraphs (2), (4), and (5), authenticated by a notary public, is filed with the employer, accompanied by an itemized statement of the amount then due to the assignee.

(7) At the time the assignment is filed with the employer, no other assignment of wages of the employee is subject to payment and no earnings withholding

---

**6.** The Court need not decide whether this is the case because California law governs the Player Contract or because it governs the Loan Documents. In analyzing the enforceability of a wage assignment, some courts apply the law of the state that governs the employment contract or in which the employment contract was to be performed, but at least one court has applied the law of the state governing the assignment, when the assignor performed at least some work in that state. *Compare Jones v. Tri–Cty. Growers, Inc.*, 179 W.Va. 218, 366 S.E.2d 726, 729 (1988) ("When matters of public policy are involved, such as authorized wage withholdings, the law of the state where the contract is to be performed governs."), *and Coleman v. Am. Sheet & Tin Plate Co.*, 285 Ill.App. 542, 2 N.E.2d 349, 351 (1936) ("[T]he assignability of unearned wages, as a right arising out of a contract of employment, is controlling here and should be determined by the same law which governs the contract of employment."),

*with Monarch Disc. Co. v. Chesapeake & Ohio Ry. Co. of Ind.*, 285 Ill. 233, 120 N.E. 743, 745 (1918) (applying Illinois law to assignment of wages made in Illinois when contract was silent as to state of performance and assignor performed some work in Illinois, even though the employer was based in Indiana). RFF concedes that California law applies. *See* Resp. at 9.

**7.** The California Labor Code broadly defines wages as "all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation." Cal. Lab. Code § 200(a) (West 2016). Labor is in turn defined to include "labor, work, or service whether rendered or performed under contract, subcontract, partnership, station plan, or other agreement if the labor to be paid for is performed personally by the person demanding payment." Cal. Lab. Code § 200(b).

order against the employee's wages or salary is in force.

Cal. Lab. Code § 300(b). Even if the foregoing requirements are met, the assignment is valid only as to wages that have been earned, unless the assignment is made "for necessities of life" to the person directly furnishing the necessities. Cal. Lab. Code § 300(h) ("No assignment of wages is valid unless at the time of the making thereof, such wages or salary have been earned, except for necessities of life and then only to the person or persons furnishing such necessities of life directly and then only for the amount needed to furnish such necessities."). No more than 50 percent of the assignor's wages or salary may be withheld by the employer under a valid wage assignment, Cal. Lab. Code § 300(c), and the assignment is revocable at any time by the assignor, Cal. Lab. Code § 300(e).

### 1. Application of Section 300 to the Debtor's Loan Transaction with RFF

■ RFF has claimed both an assignment of, and security interest in, "the payment, proceeds, and rights under and related to" the Player Contract. Sec. Agreement ¶ 2(a); Assignment ¶ 1(a). But it does not matter whether RFF characterizes its interest as an assignment or a security interest. *Lande v. Jurisich*, 59 Cal.App.2d 613, 139 P.2d 657, 659 (1943) ("While it is doubtless true that, in strict legal parlance, the mere imposing of a lien on wages to be earned in the future is not an assignment of them, we see little difference in the incidence of the two on the future condition of the worker and his family."). "[T]he [California] legislature obviously sought to reach every form of instrument which would result in the impounding of a wage earner's wages before he received them." *Id.* at 660, 139 P.2d 657, 659. Thus, whether RFF's claimed

interest in the Debtor's wages stems from a lien or an assignment, Section 300 applies. *Id.*; *People's Bank v. Gwynn (In re Gwynn)*, 82 B.R. 121, 123 (Bankr.S.D.Cal. 1988) (holding that the bank's purported security interest in the wages the debtor would receive from his baseball player contract was void due to noncompliance with Section 300). It also does not matter whether or not the Debtor intended to grant RFF an interest in his wages. Regardless of the Debtor's intent, Section 300 invalidates the security interest unless each of the statutory conditions is satisfied. *Cf. In re Rumker*, 184 B.R. 621, 624 (Bankr.S.D.Ga.1995) ("The fact that the parties may have intended a security interest to attach to certain funds is irrelevant if applicable state law and the parties' intent conflict.").

RFF argues that the Debtor "does not deserve liberal protection under [Section 300]" because he is "not within the class of people intended to be protected by the statute." Resp. at 12. According to RFF, the purpose of Section 300 is "to protect wives from the profligate assignments of their husbands," Resp. at 10–11 (quoting *Fitch*, 126 Cal.Rptr. at 450 n. 11), not an unmarried male "receiving payments under a multimillion dollar contract," *id.* at 11–12. But it is wrong to conclude that Section 300 does not apply to the Debtor merely because he was a highly compensated, unmarried male at the time the Loan Documents were signed.

First, there is nothing in Section 300—such as an income limit or reference to the federal poverty level—that would suggest the statute does not apply to a highly compensated individual like the Debtor. "The Labor Code's protections ... are applicable not only to hourly employees, but [also] to highly-compensated executives and salespeople." *Davis v. Farmers Ins. Exch.*, 245 Cal.App.4th 1302, 200 Cal.

Rptr.3d 315, 338–39 (2016), *as modified on denial of reh'g* (Apr. 21, 2016); *On–Line Power, Inc. v. Mazur*, 149 Cal.App.4th 1079, 57 Cal.Rptr.3d 698, 702 (2007) (holding that "for purposes of the Labor Code, the salaries of executives are protected wages"). In fact, Section 300 itself has been applied to a highly compensated professional athlete like the Debtor. In *Gwynn*, the bankruptcy court for the Southern District of California held that a wage assignment for a professional baseball player—who also was a party to a multimillion dollar employment contract— was invalid for failure to comply with the requirements of Section 300. *Gwynn*, 82 B.R. 121.

 Second, while RFF would have the Court focus solely on the statutory purpose of protecting innocent spouses, it ignores the fact that spousal protection is only *one* purpose of Section 300. Section 300 "manifests a legislative intent to *protect wage earners and salaried workers* against the possibility that ... they may go too far in sacrificing the future to the needs or desires of the present and leave *themselves and* their families without future means of support." *Lande*, 139 P.2d at 659 (emphasis added). To be sure, several courts have held that assignments to which a spouse did not consent were invalid. *See First Nat'l Bank of Vista v. Hellen*, 392 F.2d 58, 60 (9th Cir.1968); *Gwynn*, 82 B.R. at 123. But simply because lack of spousal consent often has resulted in the invalidation of wage assignments due to noncompliance with Section 300, it does not follow that this is the only reason a wage assignment might be held invalid. Indeed, if spousal consent were the only requirement to effectuate a wage assignment, Section 300 would not contain a number of "rigorous requirements." *Fitch*, 126 Cal.Rptr. at 448. Rather than permitting wage assignments for unmarried persons without restriction and requiring spousal consent for married ones, Section 300 instead states that "[n]o assignment of wages ... is valid *unless all of the [specified] conditions* are satisfied." Cal. Lab. Code § 300(b) (emphasis added). These words must be given "their usual, ordinary meaning," and if that is clear and unambiguous, the Court must follow the statute's plain meaning. *People v. Canty*, 32 Cal.4th 1266, 14 Cal. Rptr.3d 1, 90 P.3d 1168, 1172 (2004). Because there is nothing ambiguous about the word "all," the enforceability of the Security Agreement and the Assignment will hinge on whether RFF can show that it has met *"all* of the ... conditions" enumerated in Section 300. As discussed below, RFF has met certain of these conditions, but has fallen short of satisfying them all.

## 2. Requirements of Section 300(b)(1)– (4)

Subsection (b)(1) requires that the Assignment be "contained in a separate written instrument, signed by [the Debtor], and identifying specifically the transaction to which the assignment relates." Cal. Lab. Code § 300(b)(1). The Assignment is separate from the Note, is signed by the Debtor, and sufficiently identifies—albeit broadly—the transaction: "The assignment herein is made as collateral security for any and all indebtedness of Assignor (including, but not limited to [the Note] ...) to RFF." Assignment ¶ 2. It is undisputed that neither subsection (b)(2) nor subsection (b)(3) applies to the Debtor; he was neither married nor a minor at the time the Loan Documents were signed and therefore did not need the written consent of his spouse or a parent. Because the Debtor was "both unmarried and an adult," subsection (b)(4) required that the Assignment include or attach a written statement by the Debtor setting forth such facts. The Assignment does not include or

attach a statement that the Debtor is an adult and unmarried, but the Debtor "warrants and represents" that "[n]o person or entity is required to consent to the assignment herein." *Id.* ¶ 3(d). Although this statement would appear to be sufficient to satisfy subsection (b)(4), the Court need not resolve this question given RFF's failure to comply with certain of the other requirements imposed by Section 300.

### 3. Requirements of Section 300(b)(5) and (7)

■ Section 300(b)(5) requires that "[n]o other assignment exists in connection with the same transaction ... and a written statement by [the assignor] to that effect is attached or included in the assignment." Cal. Lab. Code § 300(b)(5). Based on the plain language of the statute, subsection (b)(5) suggests that the Debtor cannot have executed any other assignment of property to RFF in connection with the Note and that the Debtor must so state in writing. RFF argues that this condition is satisfied because the Assignment states that "[the Debtor] has not made any prior assignment of any right, title or interest in the [Player Contract] to any person or entity." Assignment ¶ 3(e). But subsection (b)(5) does not refer only to other assignments of the assignor's wages. Rather, the statutory language appears to refer to the assignment of other property in addition to wages as consideration in the same transaction,[8] and the Assignment does not contain such a statement. RFF therefore has not satisfied subsection (b)(5).

Subsection (b)(7) does relate to other assignments of the Debtor's wages, whether voluntary or involuntary: "At the time the assignment is filed with the employer, no other assignment of wages ... is subject to payment and no earnings withholding order ... is in force." Cal. Lab. Code § 300(b)(7). Neither party discusses this requirement, but based on the record, the Court finds it has not been satisfied. At the time that the Debtor executed the Assignment and at the time RFF asserts it filed a copy of the Assignment with his employer,[9] around the end of January 2014, another wage withholding order was in effect—specifically, a garnishment instituted by creditor Rodney Blum. RFF stated in the Answer that "beginning on *October 7, 2013 and each month thereafter* [the Debtor's] salary was being garnished by Rodney Blum." Answer at ¶ 16 (emphasis added). And indeed, the state court docket—of which the Court may take judicial notice[10]—shows that a garnishment of the Debtor's salary was in place from before the time the Loan Documents were signed up through the Petition Date.[11] Because an

---

**8.** Any other reading would make subsection (b)(7)—which plainly addresses other wage assignments—superfluous, and "interpretations which render any part of a statute superfluous are to be avoided." *Wells v. One2One Learning Found.*, 39 Cal.4th 1164, 48 Cal.Rptr.3d 108, 141 P.3d 225, 248 (2006), *as modified on denial of reh'g* (Oct. 25, 2006).

**9.** *See infra.*

**10.** Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it ... can be accurately and readily determined from sources

whose accuracy cannot reasonably be questioned."); *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir.2006) ("[D]ocket sheets are public records of which the court could take judicial notice."); *Rodic v. Thistledown Racing Club, Inc.*, 615 F.2d 736, 738 (6th Cir.1980) ("Federal courts may take judicial notice of proceedings in other courts of record." (quoting *Granader v. Public Bank*, 417 F.2d 75, 82–83 (6th Cir.1969)).

**11.** Franklin County Court of Common Pleas, Case No. 13 JG 033656, *available at* http://fcdcfcjs.co.franklin.oh.us/CaseInformation Online/. The docket sheet shows that Mr. Blum's garnishment order was entered by the

"earnings withholding order against [the Debtor's] wages or salary [was] in force," the Assignment did not meet the condition of Section 300(b)(7) and therefore was not valid.

### 4. Requirement of Section 300(b)(6)

Section 300 also provides that no assignment is valid unless the assignee files with the employer (1) a notarized copy of the assignment and certain written statements and (2)· "an itemized statement of the amount then due to the assignee." Cal. Lab. Code § 300(b)(6). The Debtor argues that this requirement was not met, because RFF failed to include an itemized statement of the amount due and because the non-itemized amount that was included was inaccurate. Mot. at 15; Reply at 16–17. But the Assignment's identification of the amount due would appear to be sufficient. And the statement of the amount due would not fail to satisfy Section 300(b)(6) merely because the amount stated ($1,862,-500) was different from the amount actually due. The amount in the Assignment reflected the face value of the Note. A dispute over what amount was due at a given point in time does not necessarily establish RFF's noncompliance with Section 300(b)(6).[12]

### 5. Requirement of Section 300(h)

In addition to the requirements imposed by subsection (b), Section 300(h) places yet another condition on the validity of the wage assignment. Section 300(h) provides that an assignment of wages is valid only to the extent the wages have been *earned*. An assignment of future wages is not valid "except for the necessities of life and then only to the person ... furnishing such necessities of life directly and then only for the amount needed to furnish such necessities." Cal. Lab. Code § 300(h). RFF does not—nor could it reasonably—argue that the Assignment was consideration for RFF's furnishing of the necessities of life to the Debtor. Instead, it maintains that there is a factual dispute as to whether the Debtor had already earned his salary by the time the Loan Documents were signed.[13] Given this factual dispute, RFF argues, the Debtor cannot establish as a matter of law that there was an assignment of unearned wages in violation of Section 300(h). Resp. at 16–17. And in response to the Debtor's contention that he "must still, among other things, show up, strap on skates, and play," RFF asserts that there are numerous circum-

state court at the end of September 2013 and that the Blue Jackets made disbursements under the order between November 2013 and August 2014, a period of time that includes the date on which the Loan documents were signed in January 2014. The garnishment was not released until October 16, 2014.

**12.** Exhibit 1 to the Response contains a letter dated August 21, 2014 from RFF's California counsel, Dayton Parcells, to the Blue Jackets (the "Employer Notice"). The Employer Notice states that notarized copies of the Assignment and the Letter Agreement were delivered to the Blue Jackets via certified mail on January 27, 2014. The Debtor argues that because the Employer Notice was not authenticated, it is not properly part of the summary judgment record. But he does not dispute that

the Assignment was filed with the Blue Jackets. On the other hand, RFF asserts that it "gave notice to the Blue Jackets." Resp. at 4. There is a question as to whether an affidavit would be needed to authenticate the Employer Notice under these circumstances. But given the Court's findings that RFF has not satisfied Section 300 in several other respects, it need not address that issue.

**13.** The Assignment itself appears to contemplate that some of the Debtor's salary may not have been earned at the time—it contains a statement that the Debtor "has the ... right and power to make the assignment herein to RFF including ... all moneys due *or to become due* [the Debtor] under the [Player Contract and the joint venture agreement]." Assignment ¶ 3(b) (emphasis added).

stances in which the Debtor would be paid even if he were not playing and that there is "a fact question [as to] whether and to what extent the Debtor's base salary has already been earned." Resp. at 16. But even if this is a factual question, RFF does not demonstrate the existence of a genuine issue of material fact. For as RFF has claimed in relation to many other documents in the record, the Player Contract "speaks for itself." *See* Answer at ¶¶ 25–26, 29–30.

According to RFF, the Los Angeles Kings "agreed to pay [the Debtor] a total amount of $30.5 million, including a salary of $5 million per season starting with the 2014–15 season and continuing through the end of the 2017–18 season, for so long as he remained in their employ." Resp. at 2 (citing Player Contract ¶ 1). Based on paragraph 1 of the Player Contract, RFF contends that "the Debtor ... earned his payments merely by virtue of being employed by the Blue Jackets, whether he played or not," and that the Debtor therefore had already acquired, even if he had not received, his salary payments by the time he entered into the Loan Documents. *Id.* at 19. RFF, however, misconstrues the Player Contract. Rather than providing that the Debtor will be paid so long as he

remains employed, paragraph 1 of the Player Contract actually states that "if the [Debtor] is not in the employ of the Club for the whole period of the Club's NHL Regular season games, then he shall receive only part of such Paragraph 1 Salary in the ratio of the number of days of actual employment to the number of days of the NHL Regular Season." Player Contract ¶ 1. In other words, the Player Contract provides that the Debtor's salary shall be pro rated if he is not employed during the entire season. It does not follow, however, that the Debtor was entitled to his entire salary, whether he continued to play or not, merely because he was employed at the time he executed the Loan Documents.

True, the Debtor plays hockey pursuant to the Player Contract, an agreement under which he is entitled to receive his salary even if he is "unfit for play by reason of an injury sustained during the course of his employment as a hockey [p]layer." Player Contract at ¶ 5(j). But barring such injury, the Debtor must play hockey in order to receive the full salary provided for in the Player Contract.[14] The Debtor also has other obligations under the Player Contract that he must perform or risk reduction in pay[15] or, ultimately,

14. *See* Player Contract at ¶ 5(b) ("If [the Debtor] ... is disabled or is not in good physical condition at the commencement of the season or at any subsequent time during the season (unless such condition is the direct result of any injury sustained during the course of his employment as a hockey [p]layer with the Club) so as to render him unfit to play skilled hockey, then it is mutually agreed that the Club shall have the right to suspend [the Debtor] for such period of disability or unfitness, and no compensation shall be payable for that period[.]"); *id.* at ¶ 5(j) ("If [the Debtor] is declared to be physically able to play and refuses to do so, he shall be liable to immediate suspension without pay."); *id.* at ¶ 5(n) ("If [the Debtor] is declared to be fit for play ... he must perform his duties hereunder and shall be entitled to receive the full

benefits of [the Player Contract]. If he is declared to be not physically able to play, he shall not be entitled to the benefits of [the Player Contract] ...."); *id.* at ¶ 14 ("In the event of termination [for cause,] the [Debtor] shall only be entitled to compensation due to him to the earlier of the date such notice is delivered to him or the date of the mailing of such notice ...."); *id.* at ¶ 16 ("[The Debtor] agrees that, in the event of his suspension without pay ... there shall be deducted from [his salary] an amount equal to the exact proportion of such salary as the number of days' suspension bears to the total number of days of the Regular Season Games.").

15. *See* Player Contract at ¶¶ 2–4 (listing other obligations of the Debtor and stating that "for any conduct impairing the thorough and

termination.[16]

In these respects, the Debtor's responsibilities under the Player Contract—both at the time he executed the Loan Documents and at present—are not unlike the duties of other professional athletes performing under standard league contracts. *See In re Clark*, 100 B.R. 317 (E.D.La.1989), *aff'd*, 891 F.2d 111 (5th Cir.1989). In *Clark*, the district court held that as of the commencement of his bankruptcy case, NFL player Bruce Clark had not already earned the salary he was receiving following his bankruptcy filing. The court so held despite a partial guarantee contained in Clark's player contract, noting that he "could not refuse to abide by team and League rules," that he "was hired to play football" and "could not · refuse to play ball," and that his "skill or performance ... were not ... irrelevant to receipt of his full salary [given that] he continued to be obliged to perform what the contract ordered him to perform as a player in the League." *Id.* at 319–20.

Affirming the district court's order, the Fifth Circuit noted that "[a] holding that Clark had satisfied his contractual obligations and was entitled to $575,000 the moment after passing his medical exam would certainly be unreasonable and possibly absurd." *Clark v. First City Bank (In re Clark)*, 891 F.2d 111, 114 (5th Cir.1989). So too here, where the Debtor earns his salary as he plays hockey and performs his other obligations under the. Player Contract. Thus, even if RFF complied with Section 300 in every other respect, the Assignment would have been valid only as to the salary the Debtor had earned as of the time he executed the Assignment in January 2014. *See id.*; *Wagner v. United States*, 573 F.2d 447, 455 (7th Cir.1978) ("[Future earnings] are contingent upon performance of a contract of service and represent no existing rights of property." (quoting *United States v. Long Island Drug Co.*, 115 F.2d 983, 986 (2d Cir. 1940))); *cf. Morehead v. State Farm Mut. Auto. Ins. Co. (In re Morehead)*, 249 F.3d 445, 449 (6th Cir.2001) ("It is illogical to find that a debtor may acquire rights in future wages when they have not yet been earned. The mere fact that a creditor perfects a garnishment order on a debtor's future wages does not guarantee that the debtor will ever earn any wages. The debtor retains the choice to work for the garnishee employer, to work for someone else or not to work at all.").[17]

faithful discharge of the duties incumbent upon [the Debtor], the Club may impose a reasonable fine upon [the Debtor] and deduct the amount thereof from any money due or to become due to [the Debtor]").

16. Paragraph 14 of the Player Contract provides that the Blue Jackets may "terminate [the Player Contract] upon written notice to [the Debtor]" if the Debtor materially breaches the Player Contract by "fail[ing], refus[ing] or neglect[ing] to render his services" or "to obey the ... rules governing training and conduct of [p]layers." Player Contract at ¶ 14(a)–(b).

17. The Debtor further argues that, in addition to other defects with the Assignment, RFF has "unlawfully claim[ed] the right to more than 50% of [the Debtor's] wages or salary under Section 300(c)" and "disregard[ed] Debtor's revocation of the purported wage assignment, notwithstanding that '[a]n assignment of wages to be earned is revocable at any time by the maker thereof' under Section 300(e)." Mot. at 4 (quoting Cal. Lab. Code § 300(e)). The Debtor claims that the failure of the Loan Documents to limit the assignment to only 50 percent of the Debtor's wages makes them "substantively defective," and similarly suggests the claims of irrevocability are "unlawful." *Id.* at 15–16.

Subsections (c) and (e), however, are unlike the other requirements of Section 300, and the validity of a wage assignment does not hinge on compliance with them. Section 300(c) does not make it an invalid wage assignment if the assignee requests more than 50 percent of the assignor's income. Instead,

Because RFF failed to meet all of the statutory requirements set forth in Section

it prevents, "[u]nder any [valid] assignment of wages," the collection of any higher amount. Cal. Lab. Code § 300(c). Similarly, Section 300(e) merely states that wage assignments are "revocable at any time by the maker thereof," not that an assignment is invalid if it purports to be irrevocable.

18. RFF suggests in a footnote that it did not need to comply with Section 300 to have a claim secured by the Player Contract, because "California law generally provides for the enforceability of contract assignments" and because California's version of the Uniform Commercial Code "generally recognizes the validity and enforceability of security interests in contracts rights and other general intangibles ...." Resp. at 9 n.7. Given the "perfunctory manner" in which RFF presents this argument, it may not have been properly raised. See In re Anheuser–Busch Beer Labeling Mktg. & Sales Practices Litig., 644 Fed. Appx. 515, 529 (6th Cir.2016) ("We have repeatedly held that 'the perfunctory manner in which [an] argument was presented below' may constitute a forfeiture of that argument. An observation in a footnote, for example, is not sufficient." (quoting Moorer v. Baptist Mem'l Health Care Sys., 398 F.3d 469, 487 (6th Cir.2005))).

But assuming for the sake of argument that it was properly raised, RFF's suggestion that it would have a claim secured by the Player Contract under the UCC or general California law without satisfying Section 300 is a red herring for several reasons. First, California's version of the UCC expressly carves out wage assignments from its reach. See Cal. Com. Code § 9109(d)(3) (West 2016) (providing that California Commercial Code "does not apply to ... [a]n assignment of a claim for wages, salary, or other compensation of an employee"). Second, RFF cannot rely on general California law regarding the assignment of and security interests in contracts, because Section 300 "reach[es] every form of instrument which would result in the impounding of a wage earner's wages before he received them." Lande, 139 P.2d at 660. Thus, Section 300 would apply even if RFF truly had received an interest in the entirety of Player Contract itself through an assignment or security agreement. See Gwynn, 82 B.R. at 123 (holding that purported lien on the debtor's

300, it did not have a valid assignment of the Debtor's wages as of the Petition Date.[18] The Court accordingly holds that

player contract violated Section 300 and therefore was void). Third, as the Court discusses below in analyzing the effect of § 552 of the Bankruptcy Code, RFF does not even make a passing attempt to show that the Debtor's contractual rights under the Player Contract—other than his right to receive salary payments—would have any value whatsoever as collateral in the hands of a secured creditor.

Finally, the trio of cases cited by RFF for the proposition that California law "provides for the general enforceability of contracts between parties,"—H.S. Mann Corp. v. Moody, 144 Cal.App.2d 310, 301 P.2d 28 (1956), Silverstein v. Oakland Title Ins. & Guar. Co., 122 Cal.App. 73, 9 P.2d 846 (1932), and Walker v. Rich, 79 Cal.App. 139, 249 P. 56 (1926)—are inapposite. Mann concerned the assignment of accounts receivable for the sale of goods, and Silverstein addressed the assignment of rents due under a real property lease. Such contracts are inherently different than an assignment of wages to be earned under a contract for personal services. This is so because in California, as in many other states, wages "have long been accorded a special status generally beyond the reach of claims by creditors including those of an employer. This public policy has been expressed in the numerous statutes regulating the payment, assignment, exemption and priority of wages." Kerr's Catering Serv. v. Dep't of Indus. Relations, 57 Cal.2d 319, 19 Cal.Rptr. 492, 369 P.2d 20, 24 (1962); accord Davis, 200 Cal.Rptr.3d at 338–39. And though Walker did involve an assignment of future wages, the court found the assignment to be valid because—unlike here—the statutory requirements for the assignment of wages had been met and because the assignment was "for necessaries of life to [the] party furnishing [the wage earner] such necessaries." Walker, 249 P. at 60; Cal. Lab. Code § 300(h) (prohibiting assignment of future wages "except for necessities of life and then only to the person or persons furnishing such necessities of life directly and then only for the amount needed to furnish such necessities"). Neither party goes so far as to suggest that the assignment here was for the necessities of life furnished to the Debtor by RFF. Thus, these cases do not support RFF's assertion that it holds a valid security interest

(1) RFF does not have a valid assignment of, or security interest in, the Debtor's salary under the Player Contract and (2) any allowed amount of RFF's claim is not secured by the Debtor's salary under the Player Contract. *See Hellen*, 392 F.2d 58 (affirming bankruptcy court's finding that, because the assignment of wages did not conform to the requirements of Section 300, the assignment was invalid and the creditor's claim was therefore unsecured).

## C. Section 552(a) of the Bankruptcy Code

The Court next turns to the question of the effect § 552(a) of the Bankruptcy Code has on any interest that RFF otherwise would have had in the Debtor's salary payments. Section 552(a) of the Bankruptcy Code provides that "property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." 11 U.S.C. § 552(a). Assuming for the sake of argument that RFF had a valid interest in the Debtor's salary payments under California law, the Debtor seeks a judgment declaring that § 552(a) terminates RFF's interest as to the salary payments he received after the Petition Date (the "Postpetition Salary Payments").

### 1. The Postpetition Salary Payments Constitute Property Acquired by the Debtor's Estate After the Petition Date.

In deciding whether it should enter the requested declaratory judgment, the Court first must determine whether § 552(a) applies here. Section 552(a) applies to "property acquired by the estate or by the debtor after the commencement of the case." 11 U.S.C. § 552(a). Under

§ 1115(a)(2) of the Bankruptcy Code, property of an individual debtor's Chapter 11 estate includes "earnings from services performed by the debtor after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 12, or 13, whichever occurs first." 11 U.S.C. § 1115(a)(2). The Debtor states in his affidavit attached to the Motion that he played his first game of the 2014–15 season on October 9, 2014 and received the first installment of the Postpetition Salary Payments for that season on October 15, 2014—after the October 7, 2014 Petition Date. Ex. B at 3 ("I played my first hockey game of the 2014–15 season on October 9, 2014, and did not receive any salary payments for that season until October 15, 2014."); *see also* Player Contract at ¶ 1 (providing that salary payments are paid on "the 15th and 30th day of each month following the commencement of the NHL Regular Season"). RFF does not contest this sworn statement by the Debtor, meaning that there is no genuine dispute as to this matter.

Instead, in an attempt to avoid the application of § 552(a), RFF contends that the Debtor "earned his payments [before the Petition Date] merely by virtue of being employed by the Blue Jackets, whether he played or not." Resp. at 19. As the Court discussed above, however, the Debtor earns his salary as he plays hockey and performs his other obligations under the Player Contract. The Debtor therefore did not earn the Postpetition Salary Payments before the Petition Date; instead, his bankruptcy estate has acquired and is acquiring the Postpetition Salary Payments as a result of the Debtor's performance of services under the Player Contract after the Petition Date. Because the Postpetition Salary Payments are earnings from ser-

in or assignment of the Debtor's unearned wages.

vices the Debtor performed after the Petition Date, the Debtor's bankruptcy estate "acquired" (or is acquiring) the Postpetition Salary Payments after the commencement of his case, and § 552(a) therefore applies.

### 2. The Bankruptcy Code Terminates Any Interest RFF Otherwise Would Have Had in the Postpetition Salary Payments.

"[T]he well accepted notion that a lien cannot attach to future wages in bankruptcy was first enunciated by the United States Supreme Court in *Local Loan Co. v. Hunt*, 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230 (1934)." *In re Rumker*, 184 B.R. 621, 628 (Bankr.S.D.Ga.1995). According to the Supreme Court, decisions holding that an "assignment of future earned wages" survived bankruptcy were "destructive of [one of the primary] purpose[s] ... of the Bankruptcy Act," *Local Loan*, 292 U.S. at 245, 54 S.Ct. 695, which is to permit debtors to "start afresh," *id.* at 244, 54 S.Ct. 695 (quoting *Williams v. U.S. Fid. & Guar. Co.*, 236 U.S. 549, 555, 35 S.Ct. 289, 59 L.Ed. 713 (1915)).

 Affording debtors a "fresh start" is one of the central purposes of the Bankruptcy Code as well. *See BFP v. Resolution Tr. Corp.*, 511 U.S. 531, 563, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994) (noting the "policies of obtaining a maximum and equitable distribution for creditors and ensuring a fresh start for individual debtors ... are at the core of federal bankruptcy law"); *In re Krohn*, 886 F.2d 123, 125 (6th Cir.1989) (citing *Local Loan*, 292 U.S. at 244, 54 S.Ct. 695). This is as true in Chapter 11 as it is in other chapters of the Bankruptcy Code. For as the Sixth Circuit pointed out in *Krohn*, "[a] fresh start is afforded through discharge of all or a portion of [the debtor's] debts," and "Chapter 11 permits a debtor to ... discharge debts by reorganizing, conducting his affairs, and paying creditors, in accordance with a court-approved plan[.]" *Krohn*, 886 F.2d at 125. Given the centrality of the fresh start policy, *see Denton v. Hyman (In re Hyman)*, 502 F.3d 61, 66 (2d Cir.2007) (describing the fresh start policy as "[t]he basic policy animating the Bankruptcy Code"), it would be curious indeed if prepetition security interests in, and assignments of, wages and salaries remained valid after the commencement of a case under the Bankruptcy Code.

Unsurprisingly, nothing in the Bankruptcy Code intimates that security interests in, or assignments of, postpetition wages and salaries survive bankruptcy. In fact, "[t]here is nothing in the [Bankruptcy Code] that suggests, even faintly, that assignments of future earnings may create a lien that will withstand bankruptcy." *In re Miranda Soto*, 667 F.2d 235, 237 (1st Cir. 1981). To the contrary, the Bankruptcy Code "provides specifically [that] 'property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.'" *Id.* at 237 (quoting 11 U.S.C. § 552(a)); *see also Rivera Feliciano v. Sistema de Retiro del E.L.A., Asoc.*, 111 B.R. 380, 384 (Bankr.D.P.R.1990) (citing § 552(a) for the proposition that the debtor's "assignment of wages ... could only create a valid lien in bankruptcy encumbering her contributions derived from pre petition wages"). This makes sense, because one of the goals of § 552(a) is to further the fresh start policy of the Bankruptcy Code. *See Figgers v. Dayton Power & Light Emps. Fed. Credit Union (In re Figgers)*, 121 B.R. 772, 777 (Bankr.S.D.Ohio 1990); *In re Transp. Design & Tech., Inc.*, 48 B.R. 635, 640 (Bankr.S.D.Cal.1985).

■ The Assignment purports to create an interest of RFF in the Debtor's salary payments to secure the Debtor's payment of a debt to RFF. Given the Bankruptcy Code's definitions of the terms "lien," "security agreement," and "security interest,"[19] § 552(a) applies with equal force to both the Assignment and the Security Agreement. *See, e.g., Miranda Soto*, 667 F.2d at 237; *Tr. Co. Bank v. Walker (In re Walker)*, 35 B.R. 237, 242 (Bankr. N.D.Ga.1983) (holding that § 552(a) rendered a Chapter 13 debtor's assignment of her commissions under a prepetition contract—and the creditor's security interest in those commissions—ineffective to the extent that the assignment and security interest covered commissions earned after the debtor commenced her bankruptcy case). Section 552(a) therefore invalidates both assignments of, and security interests in, individual debtors' postpetition earnings from employment. *See, e.g., Miranda Soto*, 667 F.2d at 237; *Rumker*, 184 B.R. at 629; *Ortiz Vega v. Asociación de Empleados del Estado Libre Asociado de Puerto Rico (In re Ortiz Vega)*, 75 B.R. 858, 861 (Bankr. D.P.R.1987).

Section 552(a) terminates security interests in and assignments of postpetition salary and wages in reorganization cases just as it does in other cases under which individuals may file for bankruptcy. *See Rumker*, 184 B.R. at 628 ("The fact that the present case is one under Chapter 13 of the Code is not relevant to analysis of 11 U.S.C. § 552. Section 552 applies to all Chapters under the Code."); 11 U.S.C. § 103(a). In *Rumker*, a bank asserted a security interest in "property of the debtor existing at the time the security interest

was created as well as after-acquired property," including compensation the debtor was to receive under his employment contract. *Id.* at 623. The bankruptcy court held that § 552(a) nullified any security interest the bank had in compensation the debtor had not yet earned under the employment contract on the date he commenced his bankruptcy case. *See id.* at 629; *see also In re Scott*, 142 B.R. 126, 132 (Bankr.E.D.Va.1992) ("[Section] § 552(a) would terminate any lien on the [Chapter 13] debtor's future wages upon the commencement of the debtor's bankruptcy case."); *Ortiz Vega*, 75 B.R. at 861 ("The assignment of future wages as security for a prepetition debt is rendered ineffective by § 552(a) of the Bankruptcy Code.") (footnote omitted); *Walker*, 35 B.R. at 242. In sum, by operation of § 552(a), the Postpetition Salary Payments are not subject to any interest that RFF may have had as a result of the Assignment and the Security Agreement.

## D. Section 552(b) of the Bankruptcy Code

RFF, however, maintains that it has a valid interest in the Postpetition Salary Payments by virtue of § 552(b) of the Bankruptcy Code. Section 552(b) states:

[I]f the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, products, offspring, or profits of such property, then such security interest extends to

---

19. Section 552(a) applies to "any lien resulting from any security agreement" entered into before bankruptcy. The Bankruptcy Code defines a "lien" as a "charge against *or interest in* property to secure payment of a debt or performance of an obligation." 11 U.S.C.

§ 101(37) (emphasis added). The Bankruptcy Code defines "security agreement" to mean an "agreement that creates or provides for a security interest," with "security interest" defined to mean a "lien created by an agreement." 11 U.S.C. §§ 101(50) & 101(51).

such proceeds, products, offspring, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise. 11 U.S.C. § 552(b)(1).

■■■ As the legislative history to § 552(b) points out, "[p]roceeds coverage, but not after acquired property clauses, are valid under Title 11." 124 Cong. Rec. H32,400 (daily ed. Sept. 28, 1978) (statement of Rep. Edwards), *reprinted in* 1978 U.S.C.C.A.N. 5963, at 6458; *see also In re Gross–Feibel Co.*, 21 B.R. 648, 649 (Bankr. S.D.Ohio 1982). Thus, RFF relies on § 552(b)'s use of the terms "proceeds," characterizing its security interest as a lien on the Player Contract itself and claiming an interest in the Postpetition Salary Payments on the ground that they are "proceeds" of the Player Contract. *See* Resp. at 19 ("[B]oth the Assignment ... and the Security Agreement ... grant [RFF] an interest in the Player's Contract and such interest extend[s] to the proceeds thereof."). But RFF's reliance on § 552(b) is misplaced for two reasons: (1) RFF does not have a security interest in the Player Contract separate and apart from its interest in the Debtor's salary payments; and (2) even if it did, the Postpetition Salary Payments are not proceeds of the Player Contract.

### 1. RFF's Security Interest, If Any, Extends Only to the Debtor's Salary Payments.

RFF's security interest—if it has any at all—covered only the Debtor's salary payments, not his other rights under the Player Contract. The Assignment states that the Debtor was assigning to RFF "all of [his] right, title and interest in and to *the payment*, proceeds, and rights under and related to the [Player Contract]," Assignment ¶ 1(a) (emphasis added), and the Security Agreement states that the Debtor was granting RFF a security interest in *"the payment*, proceeds, and rights under and related to [the Player Contract]," Sec. Agreement ¶ 2(a) (emphasis added). The salary payments are the collateral. True, the Assignment and the Security Agreement also reference the Debtor's "rights under" the Player Contract. But RFF has not alleged—nor could it—that it would, by enforcing its security interest, become the owner of all of the Debtor's rights under the Player Contract in the way that a mortgagee may enforce its mortgage and become the owner of the mortgagor's house, or in the way the holder of a lien on a vehicle may enforce its lien and become the owner of the vehicle. RFF could not, for example, become the holder of the rights the Debtor has under the Player Contract to contest his suspension or assert that the Blue Jackets are in default.

Nor is it at all helpful to RFF that the Assignment and the Security Agreement also reference "proceeds," because RFF's only collateral—the salary payments—are not proceeds of "property of the debtor" in which RFF holds a security interest within the meaning of § 552(b). Put differently, the salary payments under the Player Contract are the property of the Debtor securing his repayment obligation under the Note. And those salary payments cannot at once constitute RFF's primary collateral and proceeds of such collateral for purposes of § 552(b). There accordingly is no genuine dispute that to the extent RFF held a security interest at all before the Petition Date, it was solely the Debtor's salary payments, not the Player Contract itself or any other rights under the Player Contract, that constituted its collateral.

The Postpetition Salary Payments are after acquired property—acquired not only after the Assignment and the Security Agreement were signed, but also, as explained above, acquired by the Debtor's bankruptcy estate after the Petition Date. "The 552(b) exception applies to proceeds ... of encumbered property acquired postpetition if ... the security interest extends to prepetition property of the debtor *and* to proceeds ... of such property." *Philip Morris Capital Corp. v. Bering Trader, Inc. (In re Bering Trader, Inc.)*, 944 F.2d 500, 501 (9th Cir.1991). Because the Postpetition Salary Payments were acquired (and are continuing to be acquired) *after* the Petition Date, and because those payments are not proceeds of RFF's other collateral under the Player Contract (i.e., the salary payments the Debtor earned before the Petition Date), RFF has not satisfied § 552(b)'s requirement that it have a security interest in property the Debtor acquired before the Petition Date *and in proceeds of the collateral.*

## 2. The Postpetition Salary Payments Are Not Proceeds of the Player Contract.

Nor, for that matter, do the Postpetition Salary Payments constitute proceeds of the Player Contract under § 552(b), meaning that RFF would not prevail even if it were correct that it had a security interest in the Player Contract itself. Given § 552(a)'s role in effectuating the fresh start principle that was recognized by the Supreme Court in *Local Loan*, it seems unlikely that Congress intended to legislatively overrule that principle in § 552(b) with respect to postpetition salary earned

under an employment contract. And it would seem strange indeed for Congress to leave the protections of § 552(a) in place for at-will wage earners who file bankruptcy, but allow creditors to take away those protections from debtors merely because they are parties to employment contracts. For this reason, courts have held that postpetition compensation under employment contracts or similar agreements are not "proceeds" within the meaning of § 552(b). *See Rumker*, 184 B.R. at 627 (holding that the debtor's "unearned postpetition income under a contract for employment does not constitute proceeds" within the meaning of § 552(b)); *Walker*, 35 B.R. at 242 ("[T]he payment under contract of earned real estate commissions is property acquired by the debtor's estate which is not within the exceptions of § 552(b).").

Noting that § 552(b)(1) preserves certain security interests in proceeds to the extent provided by "applicable nonbankruptcy law," some courts have looked to the applicable state version of Article 9 of the UCC to define the term "proceeds," which the Bankruptcy Code leaves undefined. *See, e.g., In re Mintz*, 192 B.R. 313, 319 (Bankr.D.Mass.1996); *Rumker*, 184 B.R. at 624. As stated above, however, California's version of Article 9 states that it does not apply to "[a]n assignment of a claim for wages, salary, or other compensation of an employee," Cal. Com. Code § 9109(d)(3), so the Postpetition Salary Payments cannot be proceeds under Article 9. And even if Article 9 did apply, its definition of proceeds would not extend to the Postpetition Salary Payments.[20] Con-

---

**20.** California's version of the UCC defines proceeds to mean any of the following:

(A) Whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral.

(B) Whatever is collected on, or distributed on account of, collateral.
(C) Rights arising out of collateral.
(D) To the extent of the value of collateral, claims arising out of the loss, nonconformity, or interference with the use of, defects

struing Tennessee's version of the UCC—which contains the same definition of proceeds as is set forth in California's version of Article 9—the Sixth Circuit noted that proceeds are "obtained as a result of some loss or dispossession of the [secured creditor's] interest in th[e] collateral, not simply by its use." *1st Source Bank v. Wilson Bank & Tr.*, 735 F.3d 500, 504 (6th Cir. 2013). The Sixth Circuit therefore held that the debtor's accounts receivable were not proceeds of the equipment the debtor used in the operation of its business. *Id.*

Likewise, the Debtor generates the Postpetition Salary Payments not by "disposing" of his Player Contract, but instead by playing hockey and performing the other services required of him under the agreement. *See Rumker*, 184 B.R. at 626 ("[T]he prepetition contract for employment only generates 'proceeds' when the contract itself is exchanged based on its intrinsic value. This occurs when the contract is sold, exchanged, or otherwise disposed of, and not when it is performed."); *Far East Nat'l Bank v. U.S. Tr. (In re Premier Golf Props., LP)*, 477 B.R. 767, 776 (9th Cir. BAP 2012) (holding that postpetition green fees and driving range fees were not proceeds of the licenses the debtor granted to golfers, because "[r]evenue generated post-petition solely as a result of a debtor's labor is not subject to a creditor's pre-petition interest." (quoting *Arkison v. Frontier Asset Mgmt., LLC (In re Skagit Pac. Corp.)*, 316 B.R. 330, 336 (9th

Cir. BAP 2004))); *Clark*, 100 B.R. at 320 n. 10 (holding that § 552(b) did not apply to the debtor's salary under a prepetition player contract).[21]

Rather than looking to the UCC to define proceeds, other courts interpreting § 552(b) have relied on the definition of proceeds set forth in the provision's legislative history, which states that "[t]he term 'proceeds' is not limited to the technical definition of that term in the U.C.C., but covers any property into which property subject to the security interest is converted." H.R. Rep. No. 95-595, at 377 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, at 6333. But while the legislative history's definition of proceeds arguably is "broader than the definition in [the UCC], the ... approach [of the courts that follow the legislative history] still maintains 'conversion' as the essential aspect of 'proceeds.' " *Great–West Life & Annuity Assurance Co. v. Parke Imperial Canton, Ltd.*, 177 B.R. 843, 851 (N.D.Ohio 1994); *see also Bank of N. Ga. v. Strick Chex Columbus Two, LLC (In re Strick Chex Columbus Two, LLC)*, 542 B.R. 914, 919 (Bankr.N.D.Ga.2015) ("[P]roceeds, even in a broad sense, can only come about as the result of the replacement or substitution of the collateral[.]").

Again, a "prepetition contract for employment only generates 'proceeds' ... when the contract is sold, exchanged, or otherwise disposed of, and not when it is

---

or infringement of rights in, or damage to, the collateral.

(E) To the extent of the value of collateral and to the extent payable to the debtor or the secured party, insurance payable by reason of the loss or nonconformity of, defects or infringement of rights in, or damage to, the collateral.

Cal. Com. Code § 9102(a)(64).

**21.** The only decision RFF cites in support of its position is *Unsecured Creditors Comm. v. Marepcon Fin. Corp. (In re Bumper Sales,*

*Inc.)*, 907 F.2d 1430 (4th Cir.1990). But that case stands only for the unremarkable proposition that funds generated from the sale of the debtor's inventory and from the collection of its accounts receivable constituted proceeds of the inventory and accounts receivable. *Bumper Sales, Inc.*, 907 F.2d at 1437. The decision therefore is not at all relevant to the question of whether the Postpetition Salary Payments are proceeds of the Player Contract.

performed." *Rumker*, 184 B.R. at 626; *see also HSBC Bank USA v. UAL Corp. (In re UAL Corp.)*, 351 B.R. 916, 924 (Bankr. N.D.Ill.2006) ("[The debtor's] postpetition option to extend the ... lease is not a 'proceed' of the collateral that existed at the time of the bankruptcy filing. ... [T]he extension option was a separately acquired property right, obtained through [the debtor's] postpetition activity—precisely the sort of property right that § 552(a) protects from prepetition security agreements."). Because the Debtor's bankruptcy estate is acquiring the Postpetition Salary Payments through the Debtor's performance of his obligations under the Player Contract, not through its sale or other disposition, the Postpetition Salary Payments also are not "proceeds" of the Player Contract under the legislative history's more expansive definition of the term.

## V. Conclusion

For all of the foregoing reasons, RFF has failed to establish that there is any genuine dispute of material fact as to whether it has an interest in the Postpetition Salary Payments. Accordingly, the Court **GRANTS** the Motion. The Court will enter a separate final judgment holding, in accordance with this opinion and order, that:

1. Under California law, RFF does not have a valid assignment of, or security interest in, the Player Contract or the Debtor's earnings under the Player Contract;

2. The Postpetition Salary Payments constitute property acquired by the Debtor's bankruptcy estate after the Petition Date, and § 552(a) of the Bankruptcy Code therefore terminated any prepetition interest RFF otherwise would have had in the Postpetition Salary Payments; and

3. The Postpetition Salary Payments are not proceeds of any of RFF's collateral, and § 552(b)(1) therefore does not apply.

**IT IS SO ORDERED.**